Morton DAVIS and Richard McCall, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

COOPERS & LYBRAND, etc., et al., Defendants.

No. 90 C 7173.

United States District Court, N.D. Illinois, E.D.

March 9, 1992.

Adrianne S. Harvitt, Constantine John Gekas, Harvitt & Gekas, Ltd., Chicago, Ill., for plaintiffs.

Harold C. Wheeler, Kathleen Myalls and Alexander Vesselinovitch, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for Coopers & Lybrand.

Edward T. Joyce, James X. Bormes, Joyce & Kubasiak, P.C., Susan Irion, Marshall E. Hanbury, Tyrone C. Fahner, Mayer, Brown & Platt, Chicago, Ill., for Karsten Mahlmann and Vincent Ciaglia.

Stephen B. Diamond, William H. London, Beeler, Schad & Diamond, P.C., Chicago, Ill., for Thomas Egan and M. Eugene Bogner.

Kenneth F. Berg, Fishman & Merrick, P.C., Chicago, Ill., for Phillip Zarcone.

Michael M. Conway, John F. Zabriskie, Hopkins & Sutter, Chicago, Ill., for R.G. Dickinson & Co.

James J. Moylan and Associates, Ltd., Chicago, Ill., for LaSalle St. Securities, Inc.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, District Judge.

Investors in two commodity pool limited partnerships, Advanced Portfolio Management, Limited Partnership ("Advanced") and Compass Futures Fund ("Compass"), bring this class action against numerous defendants related in various ways to Stotler Funds, Inc. ("S Funds"), general partner and operator of the two pools. In an action that stems from the assertedly fraudulent diversion of several million dollars in pool funds, plaintiffs invoke a wide array of federal and state statutes.

Their federal claims are brought under Commodity Exchange Act ("CEA") §§ 4b, 4o, 13(a) and 22 (7 U.S.C. §§ 6b, 6o, 13c(a) and 25); Securities Exchange Act of 1934 ("1934 Act") §§ 10(b) and 20(a) (15 U.S.C. §§ 78j(b) and 78t(a)) and Securities and Exchange Commission ("SEC") Rule 10b–5 (17 C.F.R. § 240.10b–5); Securities Act of 1933 ("1933 Act") §§ 11, 12 and 15 (15 U.S.C. §§ 77k, 77l and 77o ); and the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961–1968). They also sue under several Illinois statutes— the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill.Rev.Stat. ch. 121½, ¶¶ 261–72); the Illinois Securities Law of 1953 (id. ¶¶ 137.1–137.19); the Illinois Uniform Fraudulent Transfer Act (Ill. Rev.Stat. ch. 59, ¶¶ 101–112); and the Illinois Fraudulent Conveyance Act (id. ¶¶ 4– 7 [1])—and under the common law of Illinois.

Various of the defendants now move to dismiss plaintiffs' 17–count Second Amended Class Action Complaint (the "Complaint") under Fed.R.Civ.P. ("Rule") 12(b)(6) and 9(b). For the reasons stated in this memorandum opinion and order, those motions are granted in part and denied in part, while ruling must be deferred as to yet other parts pending further discovery.

### Allegations of the Complaint [2]
### Defendants and Related Parties

This lawsuit grew out of the financial downfall of Stotler Group, Inc. ("Stotler") and its numerous subsidiaries.[3] One of those subsidiaries (¶ 19), Stotler and Company ("S & Co."), was a Commodities Futures Trading Commission ("CFTC")-registered futures commission merchant ("FCM").[4] It acted as a broker for public investors in commodity futures transactions and in that capacity served as a clearing broker for Advanced and Compass (¶¶ 25, 51, 65). S Funds, which was general partner and operator of the two commodity pools during the relevant time frame, is a CFTC-registered commodity pool operator ("CPO") and also a Stotler subsidiary (¶¶ 20–21). None of those corporate entities is itself a defendant in this action.

R.G. Dickinson & Co. ("Dickinson"), also a Stotler subsidiary, is an NASD-registered securities broker-dealer as well as a CFTC-registered FCM (¶ 26). Dickinson sold Compass limited partnership interests and was also the recipient of the diverted pool funds (¶¶ 27, 82, 84). LaSalle St. Securities, Inc. ("LaSalle") is also a registered securities broker-dealer and also sold Compass limited partnership interests (¶¶ 36, 39). Both Dickinson and LaSalle are defendants in this action, and each has filed a motion to dismiss.

M. Eugene Bogner ("Bogner") is a director of both Stotler and S Funds, an executive vice president and director of S &

---

**1.** As of January 1, 1990 the Illinois Fraudulent Conveyance Act was repealed and supplanted by the Illinois Fraudulent Transfer Act.

**2.** Rule 12(b)(6) principles require this Court to accept as true all of the Complaint's well-pleaded factual allegations, drawing all reasonable inferences in plaintiffs' favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir. 1987) (per curiam)). Paragraphs in the Complaint will be cited simply "¶ —" or, when discussed in the text, "Complaint ¶ —."

**3.** Lacking information to the contrary, this opinion will assume (except where otherwise indicated) that the named corporate entities and their registrations with the various regulatory agencies still exist. It will also reflect the corporate officerships and directorships at the time this action was brought, as alleged in the Complaint.

**4.** S & Co.'s FCM registration was revoked on August 21, 1990 (*In re Stotler & Co.*, 1990 WL 294094, 1990 CFTC LEXIS 384) (¶ 115).

Co. and a partner in Stotler Partnership ("S Partnership"), which owns 77.5% of Stotler's outstanding stock (¶ 29). Thomas Egan ("Egan") is president and chief executive officer of Stotler, an officer and director of S Funds, president and a director of S & Co., a partner in S Partnership and a vice president and director of LaSalle (¶¶ 29, 37). Karsten Mahlmann ("Mahlmann") is chairman of the board and a director of Stotler, a vice president and director of S Funds, a director of S & Co. and a partner in S Partnership (¶¶ 29, 31). Vincent Ciaglia ("Ciaglia") is an executive vice president and director of Stotler and a partner in S Partnership (¶ 29). Robert Stotler ("Robert") is an executive vice president and director of Stotler, secretary, treasurer and a director of S Funds, an executive vice president and director of S & Co. and a partner in S Partnership (¶ 29). All those individuals are defendants in this action and have filed a joint motion to dismiss.

Defendant Phillip Zarcone ("Zarcone") is the chief financial officer of Stotler, chief financial officer, secretary and treasurer of S Funds and an officer of S & Co. (¶ 29). Zarcone has filed a separate motion to dismiss.

Howard Stotler ("Howard") is chairman of the Executive Committee and a director of Stotler, a vice president and director of S Funds, a director of S & Co. and a partner in S Partnership (¶¶ 29, 31). Attorney Thomas Kolter ("Kolter") is a director of Stotler and president, general counsel and chief operating officer of S Funds. During the relevant time period he was also general counsel to both Advanced and Compass (¶¶ 29, 42). Attorney John Dolkart ("Dolkart") is a director of Stotler (¶¶ 29, 43). Although Howard, Kolter and Dolkart are defendants, none of them has filed a motion to dismiss. Hence the claims against

them are not separately considered in this opinion.

Finally, defendant Coopers & Lybrand ("Coopers") is a public accounting firm that performed accounting services for Stotler, S & Co., S Funds, Dickinson, Advanced and Compass (¶¶ 35, 126–28) during the relevant time frame. Coopers too has filed a motion to dismiss.

*Alleged Fraud Scheme*

S & Co., in connection with its registration as an FCM, and Dickinson, in connection with its registration as an FCM and a broker-dealer, were subject to various regulatory minimum net capital requirements (¶¶ 52–54). Because it was a publicly held corporation, Stotler was subject to similar requirements imposed by the SEC (¶ 57). "At some time within the past three years" Stotler, S & Co. and Dickinson began to suffer financial problems and had difficulty maintaining those minimum capital requirements (¶¶ 60–61).

According to plaintiffs, the individual defendants therefore schemed to raise the needed funds by selling limited partnership interests in commodity pools through S Funds. Advanced and Compass were among the pools organized in that manner (¶¶ 63–64). Although defendants allegedly intended to divert pool funds from the time of the pools' inception, the pools did engage in commodities and commodity futures trading (¶¶ 65, 67, 73).[5]

In January 1989 S Funds filed a registration statement for Compass with the SEC and issued a prospectus. Those documents, both of which included accountants' reports prepared by Coopers, were allegedly false and misleading in that they (1) stated that pool funds would be used for commodities trading only and (2) failed to disclose the financial instability of Stotler and its various subsidiaries (¶¶ 68–71). In February 1989 S Funds issued and filed with CFTC a disclosure document for Com-

---

5. Plaintiffs' theory that defendants intended to divert pool funds from the time that the pools were organized (which is based only on conclusory allegations) is suspect even if this Court draws all reasonable inferences in plaintiffs' favor. While Complaint ¶ 60 states that S & Co. and Stotler began to experience financial diffi-

culties "some time within the past three years," Compass was organized in November 1986 (¶ 67) and Advanced was organized in July 1987 (¶ 73). It therefore appears from plaintiffs' own allegations that the pools were organized before the onset of Stotler's financial crisis.

pass that contained similar statements as to the intended use of pool funds (¶ 74). Plaintiffs relied on all those documents in making their investment decisions (¶¶ 72, 77).

On various dates between September 1987 and March 1990 "Stotler Funds and/or APM" issued and filed with CFTC disclosure documents for Advanced that stated that pool funds would be either used for commodities trading or held as reserves for margin payments (¶¶ 75–76). Plaintiffs also relied on those statements in making their investment decisions (¶ 77).

At apparent odds with plaintiffs' earlier theory that the conspiracy began when the pools were first organized, Complaint ¶¶ 79 and 80 allege that in late 1989, when Stotler's financial situation "reached crisis proportions," the individual defendants (¶ 80):

> agreed and conspired to purloin, steal and convert the funds of APM [Advanced] and Compass in a desperate attempt to shore up the deteriorating financial conditions of Stotler and Company, R.G. Dickinson & Co., and/or Stotler Group....

In December 1989 $1 million of Advanced's funds and $3 million of Compass' funds [6] were sent to Dickinson by interstate wire pursuant to the orders of Egan, Kolter, Bogner and Zarcone (¶¶ 79–84). In exchange for those funds Stotler issued a promissory note to Advanced and commercial paper to Compass [7] (¶¶ 88, 92–93). Given Stotler's financial situation, however, the promissory note and commercial paper were worth substantially less than their facial value from the time they were issued, and the pool funds were essentially lost to plaintiffs at that time. Only $450,000 of the commercial paper was ever redeemed (¶¶ 98, 102).

Because those transactions violated the Advanced and Compass partnership agreements, the individual defendants, assisted by Coopers, attempted to conceal them from the investors by issuing a series of allegedly fraudulent documents (¶ 99). Between January and July 1990 they sent the investors monthly financial statements that failed to disclose the commercial paper and promissory note transactions and that falsely represented the financial situation of the pools (¶ 100). They also filed federal tax returns and sent Schedule K–1 tax forms to investors that failed to disclose the partnerships' losses (¶ 102). During that six month period between January and July 1990 the various individual defendants also filed numerous forms and documents with CFTC and SEC on behalf of Compass, Stotler and S & Co. that failed to disclose the transfer of funds (¶¶ 112, 117–24).[8]

### Rule 9(b): Pleading Fraud "with Particularity"

As a preliminary matter, each of LaSalle (its Mem. 3), Coopers (its Mem. 12–15), Dickinson (its Mem. 5–6) and Zarcone (his Mem.Ex. A 5–8) argues that plaintiffs have failed to satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud ... shall be stated with particularity." As *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir.1990) (quoting the court below in that case) teaches:

> To meet the particularity requirements of Rule 9(b), a complaint must specify the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.

Although the Complaint is for the most part sufficiently specific as to the time, place and content of the misrepresentations

---

**6.** Although the Complaint later alleges that net transfers of $4.55 million had been made from Compass (see, e.g., ¶¶ 98, 134–35)—which would mean that another $2 million was transferred, and at some later point the $450,000 referred to in ¶ 102 was redeemed—the Complaint does not specify when or how the additional funds were diverted. Other litigation before this Court (assigned to its calendar by sheer coincidence) has confirmed the $4.55 million figure, and that is

expressly reflected in Coopers' December 31, 1989 audit of Compass as well.

**7.** "Commercial paper," of course, is also a simple debt instrument—another promissory note.

**8.** Complaint ¶¶ 126, 130–33, 142–48, 153–54 and 157–60 describe Coopers' involvement in the alleged cover-up.

as well as the method by which they were communicated,[9] plaintiffs' allegations identifying the persons involved are less precise. Their Complaint tends to aggregate the defendants and in many instances fails to specify for which particular acts or in what capacity the various defendants are potentially liable.[10] Application of Rule 9(b) to such allegations raises competing considerations.

■ First, a complaint's allegations obviously must be sufficiently specific to allow both defendants and this Court to respond. Thus, as *Sears*, 912 F.2d at 893 (continuing to quote the district court) points out:

A complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient.

Instead a complaint must specify "who was involved in what activity" (*id.* in the Court of Appeals' own language) so that each defendant is notified of the charges targeting that defendant and can respond accordingly (*Wislow v. Wong*, 713 F.Supp. 1103, 1105–06 (N.D.Ill.1989); *Coronet Ins. Co. v. Seyfarth*, 665 F.Supp. 661, 666 (N.D.Ill. 1987); *Kennedy v. Nicastro*, 503 F.Supp. 1116, 1122 (N.D.Ill.1980)).

■ At the same time, some degree of confusion may be unavoidable when particularly complex transactions with multiple participants are involved. As this Court has stated in an earlier case, that Rule 9(b) "requirement is tempered by the fact that with complex transactions over an extended period of time, somewhat less specificity is required" (*Mutuelle Generale Francaise Vie v. Life Assurance Co. of Pennsylvania*, 688 F.Supp. 386, 393 (N.D.Ill.1988); see also *Wislow*, 713 F.Supp. at 1105 n. 4). Thus *Moore v. Kayport Package Express,*

*Inc.*, 885 F.2d 531, 540 (9th Cir.1989) has said:

Instances of corporate fraud may also make it difficult to attribute particular fraudulent conduct to each defendant as an individual. To overcome such difficulties in cases of corporate fraud, the allegations should include the misrepresentations themselves with particularity and, where possible, the roles of the individual defendants in the misrepresentations.

■ In addition, "[p]laintiffs are not required to allege facts that are in the exclusive possession of the defendants" (*Wislow*, 713 F.Supp. at 1105), as appears to be the case with many of the missing facts here. Earlier opinions by this Court have made the point that a strict application of Rule 9(b) to situations where defendants are in sole possession of some specifics about the alleged fraud may put plaintiffs in an untenable Catch–22 situation: They are unable to gain access to those facts unless they are allowed to stay in court and proceed with discovery, and they are unable to stay in court if they cannot allege the yet-to-be-discovered facts (*Refco, Inc. v. Troika Inv. Ltd.*, 702 F.Supp. 684, 689 (N.D.Ill.1988); *Ramson v. Layne*, 668 F.Supp. 1162, 1171 (N.D.Ill.1987)).

Flexibility is particularly appropriate in this case, which clearly does not involve plaintiffs coming to court with concocted allegations "as a pretext for discovery of unknown wrongs," one of the abuses that Rule 9(b) is meant to prevent (*McKee v. Pope Ballard Shepard & Fowle, Ltd.*, 604 F.Supp. 927, 930 (N.D.Ill.1985)). Here the Complaint is sufficiently particular to support more than a reasonable inference of fraudulent activity. It appears that plaintiffs may well have been as specific as they can be without having access to information that resides solely with Stotler insid-

---

**9.** Any Rule 9(b) problems that do exist in connection with these elements will be addressed as they arise.

**10.** Thus the allegations read (using Count III ¶ 179 as an example):

[E]ither acting as principals or as aiders and abettors, or as controlling persons ... Coopers & Lybrand, Mahlmann, or Bogner, or Egan, or Howard Stotler, or Robert Stotler or

Ciaglia, or Zarcone, or Kolter, or Dolkart, or R.G. Dickinson & Co., or LaSalle St. Securities, or some or all of those defendants....

Some of the factual assertions also either list defendants disjunctively or refer to "defendants" collectively without specifying which of the various defendants is actually implicated (see, e.g., ¶¶ 75, 80, 99–100, 118).

ers. As it reviews the various counts of the Complaint, this Court will therefore raise Rule 9(b) concerns only when the lack of specificity truly prevents both defendants and this Court from addressing the allegations on substantive grounds.

### Commodity Exchange Act
### (Counts I and II)

Complaint Counts I and II, brought against all defendants, allege fraud in violation of CEA ¶¶ 4b, 4o, 13(a) and 22, 7 U.S.C. ¶¶ 6b, 6o, 13c(a) and 25.[11] Count I ¶ 175 charges that defendants "deceiv[ed] ... and wilfully cheated and defrauded" plaintiffs by using pool funds intended for trading in commodities and commodities futures to make loans and purchase debt instruments, and by thereafter concealing those transactions. Count II ¶¶ 177 alleges a violation of CFTC Regulations §§ 4.21(g)(2) and 4.21(h),[12] 17 C.F.R. §§ 4.21(g)(2) and 4.21(h), which require pool operators (1) to amend disclosure documents within 21 days after they either know or have reason to know that the documents contain inaccuracies (Reg. § 4.21(g)(2)) and (2) to disclose all material information to existing and prospective pool participants (Reg. § 4.21(h)).

### Private Right of Action under CEA

■ Although defendants with one exception (Coopers Mem. 18–19) have failed to raise it in their arguments for dismissal, the most significant problem with plaintiffs' CEA claims is that they far exceed the limited scope of the private right of action under that statute. Here are the relevant provisions of CEA § 22(a), part of the section that was added to CEA by the Futures Trading Act of 1982:

(1) Any person .... who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in clauses (A) through (D) of this paragraph and caused by such violation to any other person—

 \* \* \* \* \* \*

(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of—

 \* \* \* \* \* \*

(iii) an interest or participation in a commodity pool....

By its literal and plain language, the "such person" specification in CEA § 22(a)(1)(C) limits the statutory remedy to obtaining damages from the persons who sold or took orders for interests in the commodity pool (In re ContiCommodity Services, Inc. Securities Litigation, 733 F.Supp. 1555, 1567 (N.D.Ill.1990), Grossman v. Citrus Assocs. of the New York Cotton Exch., Inc., 706 F.Supp. 221, 230–31 (S.D.N.Y.1989)).[13] In addition, CEA § 22(a)(2) provides expressly that with the exception of certain enumerated instances that do not apply here:

the rights of action authorized by this subsection ... shall be the exclusive remedies under this chapter available to any person who sustains loss as a result of any alleged violation of this chapter.

According to the Complaint, only Dickinson and LaSalle among the defendants sold limited partnership interests in the two commodity pools (¶¶ 27, 39).[14] Because plaintiffs therefore have no CEA right of

---

**11.** This opinion will refer to those provisions according to CEA's internal section numbering rather than to their numeration in the United States Code. Citations will take the form "CEA § —."

**12.** Those provisions are hereafter cited "Reg. § —."

**13.** Thus it is irrelevant for purposes of CEA liability that another of the named defendants (whether Coopers or anyone else) might arguably have aided and abetted the fraudulent sales of commodity pool participations. Such an aid-

ing and abetting defendant (a "person" in the opening clause of CEA § 22(a)(1)) would not be liable to the purchaser (a "person" referred to just above the first \* \* \* line in this opinion's quotation from the statute) anyway, because that last-mentioned "person" had not bought the participation from or through the defendant "person," as required by CEA § 22(a)(1)(C).

**14.** As will be discussed below, this Court did not certify a class against Dickinson and LaSalle in regard to 1933 Act § 12(2), which also requires a buyer-seller relationship, because of the fact that neither Davis nor McCall had purchased his

action against the other defendants, Counts I and II are dismissed against all defendants other than Dickinson and LaSalle.[15] Accordingly the remaining CEA discussion will be limited to those defendants.

*CEA § 4b*

■ Dickinson Mem. 6–7 & n. 3 argues that plaintiffs' claims under CEA § 4b must be dismissed because the alleged fraud did not occur "in or *in connection with* any order to make, or the making of, any contract of sale of any commodity ... or ... any commodity for future delivery" (emphasis added), which is the only coverage of that section.[16] While it is true that courts have not applied CEA § 4b to fraud

15. Plaintiffs argue that the universe of parties potentially subject to a private damages action is expanded by CEA § 13(a), which also provides for aider and abettor liability under that statute. Plaintiffs cite *ContiCommodity*, 733 F.Supp. at 1567, which has so held. Here is CEA § 13(a):

> Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

*ContiCommodity* apparently based its conclusion on the legislative history of the Futures Trading Act of 1982, which amended CEA § 13(a) by removing its previously-existing restriction to "administrative proceedings under this chapter" and was thus said in the legislative history to have extended its reach to "all legal proceedings arising under the Act" (H.R.Rep. No. 565, 97th Cong., 2d Sess. 104, reprinted in 1982 U.S.Code Cong. & Ad. News 3871, 3953). This Court respectfully disagrees with the reasoning of its colleague Honorable William Hart,

who authored *ContiCommodity*. No private damage remedy is *expressly* granted under CEA except in the partially text-quoted CEA § 22(a)(1), which was added contemporaneously with the amending of CEA § 13(a). Plainly Congress knew very well how to create a private right of action in unambiguous terms when it wanted to do so, as it did in CEA § 22(a)(1). That being so, and given the Supreme Court's unwillingness to stretch statutory language to imply such private causes of action when Congress has not given a clear signal of its intention in that respect, there is no reason to ascribe such a back-door importation through CEA § 13(a) of far wider aider-and-abettor liability to commodities pool investors than CEA § 22(a)(1) so carefully and precisely defines. This is not simply an application of the doctrine of construction that a specific statute prevails over a general one. Nor does it fail to give full meaning to CEA § 13(a) as amended, or to its legislative history stating that it was expanded to "assure the consistent treatment of aiders and abettors both in administrative proceedings and before the courts" (H.R.Rep. No. 565, 1982 U.S.Code Cong. & Ad.News at 3902), for the main focus of court proceedings under CEA has been and still is on lawsuits other than private damage actions. Nor in this Court's view is that conclusion altered by the decision in *Ikuno v. Yip*, 912 F.2d 306, 312 (9th Cir.1990), which simply announced (in a brief declarative sentence) that CEA § 22(a) "provides for a private right of action for aiding and abetting violations," without the slightest examination or discussion of the matter.

---

limited partnership interests from Dickinson or LaSalle. That fact does not preclude this Court from addressing the class claims against Dickinson and LaSalle under CEA § 4b. Because defendants did not raise this issue before the classes were certified, the entire classes are now the plaintiffs in this action and thus have a legal status and interests separate from those of Davis and McCall (*Sosna v. Iowa*, 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975); *Holmes v. Fisher*, 854 F.2d 229, 232–33 (7th Cir.1988); *Price v. Pierce*, 823 F.2d 1114, 1118 (7th Cir. 1987)). And because Complaint ¶¶ 27 and 39 provide more than a reasonable basis for inferring that at least some of the class members did purchase their Compass partnership interests from Dickinson and LaSalle, there is no Article III problem that prevents this Court from addressing this claim. Although LaSalle asserts that it did not in fact sell any partnership interests (its Mem. 9–10), that factual dispute is not relevant in the Rule 12(b)(6) context.

16. CEA § 4b provides in relevant part:

> It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person ...
> (A) to cheat or defraud or attempt to cheat or defraud such other person;
> (B) willfully to make or cause to be made to such other person any false report or state-

that occurs in the management of accounts but is not related to any particular commodities transaction (*Hagstrom v. Breutman,* 572 F.Supp. 692, 697 (N.D.Ill.1983) [17]; cf. *Kearney v. Prudential–Bache Securities, Inc.,* 701 F.Supp. 416, 424–27 (S.D.N.Y.1988)), the section does apply to misrepresentations made during the solicitation and sale of the limited partnership interests.[18]

*Hirk v. Agri–Research Council, Inc.,* 561 F.2d 96 (7th Cir.1977) provides clear authority on that issue. Hirk, who had entered into an agreement with defendants to open a discretionary futures trading account, sued under CEA § 4b alleging that defendants had made various misrepresentations during their solicitation of that agreement (*id.* at 98). Based on the legislative history of CEA § 4b and related statutes [19] and the Supreme Court's discussion of similar language in the 1934 Act,[20] *Hirk, id.* at 103–04 concluded that Congress meant the "in connection with" language to include misrepresentations made even before trading had begun—more specifically, during the solicitation of commodities trading accounts. *Hirk, id.* at 104 said that "[t]he plain meaning of such broad language cannot be ignored" and that:

> ment thereof, or willfully to enter or cause to be entered for such person any false record thereof;
>
> (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person....

Clearly Congress has recognized through the years that fraudulent and deceptive conduct in connection with futures transactions can and does occur prior to the actual opening of a trading account and has intended to regulate it by including the "in connection with" language in Section 4b.

*Saxe v. E.F. Hutton & Co.,* 789 F.2d 105, 110–11 (2d Cir.1986) has since agreed with *Hirk*'s reasoning as to misrepresentations made during the solicitation of trading accounts. Accordingly it reaffirmed an earlier Second Circuit holding that " 'material misrepresentations about the nature of the organization handling [an] account, the people [dealt] with, and *the type of trading [the] funds were being used for* ' would be sufficient to state a cause of action pursuant to the CEA" (*id.* at 110 (emphasis added)).[21]

Contrary to Dickinson's argument (its Mem. 6), the fact that the commodities trading "account" in this instance was in the form of a limited partnership is irrelevant. What matters for purposes of the CEA is the purpose for which investment is made—that of commodities trading—and not the form that the investment takes. Thus *Bosco v. Serhant,* 836 F.2d 271, 280 (7th Cir.1987) holds that both securities and ors to defraud not only clients and participants but also their *prospective* clients and participants. *Hirk, id.* (emphasis in original) also noted testimony regarding the creation of the Commodity Exchange Commission in 1974 that referred to the:

> existence of schemes of systematic *solicitations* and *bilking of unsophisticated potential customers* attracted to certain non-regulated futures contracts investments by *misleading advertising.*

17. *Hagstrom* did not apply that reasoning to torpedo the complaint there at the Rule 12(b)(6) stage. Instead it said that if plaintiffs could not later establish fraud in connection with a specific contract, defendants would ultimately prevail on a motion for summary judgment (572 F.Supp. at 697).

18. Dickinson's argument based on the "in connection with" language focuses exclusively on the later misconduct and does not refer to the alleged original misrepresentations (Dickinson Mem. 6–7 & n. 3).

19. *Hirk, id.* at 104 referred to Section 205(a) of the CFTC Act of 1974 (7 U.S.C. § 6*o*), which made it unlawful for commodity trading advis-

20. *Hirk, id.* pointed to and quoted *Superintendent of Ins. of New York v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12–13, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971) as having taught that similar language in 1934 Act § 10(b) "must be read 'flexibly, not technically and restrictively,' although the deceptive practices merely 'touch' the sale of securities."

21. *Saxe, id.* at 111 also relied on the CEA's legislative history and concluded that it points to a broad application of that statute and indicates an intention to cover misrepresentations made during the solicitation of accounts.

commodities laws apply to limited partnerships (which are themselves securities) that are organized to engage in commodities trading.

But although fraud may have occurred in connection with the sale of the limited partnership interests, the Complaint still fails to state a CEA § 4b claim against either Dickinson or LaSalle for that fraud, because it does not allege that they acted with scienter. Although our Court of Appeals has not comprehensively addressed the degree of scienter required under CEA § 4b, it has concluded in *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 838 F.2d 904, 908 (7th Cir.1988) and *Hlavinka v. CFTC*, 867 F.2d 1029, 1033 (7th Cir.1989) that negligent conduct is not covered by that statute, in each instance citing with approval *Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 822–23 (10th Cir.1986) (which in turn states that CEA § 4b requires a "willful" violation). This Court itself has previously concluded in *McCarthy v. Paine-Webber, Inc.*, 618 F.Supp. 933, 938–41 (N.D.Ill.1985) that the plain language of CEA § 4b ("cheat," "defraud," "willfully") indicates its intention to prohibit only deliberate or at the very least reckless conduct.

But it proves unnecessary to settle on a precise determination of the appropriate standard, because the Complaint does not support any inference in any event as to Dickinson's or LaSalle's "state of mind" at the time that each sold the partnership interests. Although Rule 9(b) does provide that (unlike the other elements of fraud) "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally," *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.1990) makes it plain that "the complaint still must afford a ba-

sis for believing that plaintiffs could prove scienter" (accord, also in the 1934 Act § 10(b) context, *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir.1990)). Complaint ¶ 175, which states plaintiffs' CEA § 4b claim, merely mimics the statutory language by alleging that defendants "wilfully cheated and defrauded or attempted to cheat and defraud." However, no *facts* are alleged [22] to support an inference that either Dickinson or LaSalle knew that the disclosure documents were false at the time they sold the partnership interests or that either of them intended to cheat or defraud investors at that time.[23]

Nor is there any indication that the knowledge or intent of any of the individual defendants is somehow attributable to Dickinson or LaSalle via the respondeat superior provisions of CEA § 2(a)(1)(A).[24] First, plaintiffs' conclusory allegations that the various individuals were "controlling persons" or "principals" of Dickinson or LaSalle (¶¶ 33, 38) provide no indication that the individuals were "official[s], agent[s], or other person[s] acting for" either Dickinson or LaSalle when those individuals engaged in any of the relevant conduct. In addition, even though Egan (who appears to have been significantly involved in the alleged fraudulent activity) was a vice president and director of LaSalle (¶ 37), his actions were not allegedly undertaken "within the scope of his [LaSalle] employment or office," as required by CEA § 2(a)(1)(A).

Plaintiffs have therefore failed to state a CEA § 4b claim against either Dickinson or LaSalle. To that extent the Complaint is dismissed.

---

**22.** This is a good demonstration of the reason that allegations as to the circumstances constituting fraud are made an express exception to the general notice-pleading regime under the Rules.

**23.** It is worth noting that even though plaintiffs assert that Dickinson was involved in the scheme at the time the funds were transferred, there is no indication that Dickinson was in the picture earlier, when the interests were originally sold.

**24.** That provision, now codified at 7 U.S.C. § 4, reads:

> For the purpose of this chapter the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

*CEA § 4o*

■ Not restricted like CEA § 4b by the "in connection with" language, CEA § 4o prohibits fraud more generally, while at the same time it limits the persons who are potentially liable under its broad reach.[25] That section applies only to "commodity trading advisors" ("CTAs"), "commodity pool operators" ("CPOs"), and "associated persons" of either of those categories.[26]

Neither LaSalle nor Dickinson is a CTA or a CPO. In addition, the Complaint does not allege that either of LaSalle or Dickinson was or should have been registered as associated persons of S Funds (the only CPO involved here) according to CEA § 4k. CEA § 4o can therefore be applied to those defendants, if at all, only through the aider and abettor language of CEA § 22(a)(1)(C).[27]

■ Aiding and abetting liability under the CEA requires the same degree of scien-

ter as is required in criminal law (*Bosco*, 836 F.2d at 279).[28] Plaintiffs must therefore allege that LaSalle and Dickinson acted with "knowledge of the principal's objective" and "a desire to help him attain it" (*id.*). Because CEA § 4o is not limited to fraud that occurred in connection with the sale of the limited partnership interests, the question here is whether Dickinson or LaSalle acted with the requisite scienter at any time.

■ Complaint ¶¶ 81–86, which state that Dickinson asked for and received $4 million (but see n. 6, which suggests that another $2 million—or $1.55 million after partial repayment—was also transferred), and Complaint ¶ 88, which says that Dickinson issued account statements showing Compass' purchase of Stotler commercial paper, reasonably support the inference that Dickinson did act with knowledge of the other defendants' objective and a desire

25. CEA § 4o reads in relevant part:
 (1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
 (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
 (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant. ·

26. CEA § 2(a)(1)(A) (codified at 7 U.S.C. § 2) defines a CTA as:
 any person who, for compensation or profit, engages in the business of advising others ... as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery ..., any commodity option ..., or any leverage transaction ..., or who, for compensation ·or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the foregoing....
 CEA § 2(a)(1)(A) then defines a CPO as:
 any person engaged in a business which is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of

securities, or otherwise, for the· purpose of trading in any commodity for future delivery....
 CEA § 4k, which requires the registration of associated persons, says that they include:
 (2) ... any person [who is] associated with a commodity pool operator as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged ... [and]
 (3) ... any person [who is] associated with a commodity trading advisor [in any of the above-listed positions] in any capacity which involves (i) the solicitation of a client's or prospective client's discretionary account or (ii) the supervision of any person or persons so engaged....

27. That potential source of liability does not confront the difficulties previously dealt with in analyzing a private right of action against a nonseller of interests in a commodities pool. In this instance CEA § 22(a)(1) expressly grants a private right of action against the actual seller of a commodity pool participation who has aided and abetted some other person's violation of (say) CEA § 4o.

28. Although *Bosco* discusses aiding and abetting in the context of CEA § 13(a), there is no reason to believe that a different standard applies under CEA § 22.

to help them obtain it.[29] But as to LaSalle, none of the allegations support an inference of scienter, even in the expanded time frame. And as stated earlier, Egan's actions do not appear to have occurred within the scope of his position with LaSalle and therefore do not bear on LaSalle's potential aider and abettor liability.

Because neither CEA § 4b nor CEA § 4o thus applies to LaSalle, it is dismissed from Count I. That count does stand against Dickinson, which is potentially liable there only under CEA § 4o.

*Regulatory Violations*

■ As for Count II, Dickinson Mem. 13 argues and plaintiffs effectively concede (P.Mem. 27) that with certain inapplicable exceptions the exclusive private remedy under CEA § 22 does not include a cause of action for violations of CFTC Regulations (*ContiCommodity*, 733 F.Supp. at 1568; *Khalid Bin Alwaleed Found. v. E.F. Hutton & Co.*, 709 F.Supp. 815, 817–20 (N.D.Ill.1989)). Plaintiffs Mem. 27 argues that Count II should nonetheless be allowed to stand because the violations are probative of liability under CEA § 4o. Even if that is true, however, those alleged violations have already been incorporated into Count I ¶ 174. Count II is therefore wholly redundant for that purpose and is accordingly dismissed.

*Securities Fraud*

*1934 Act § 10(b) and Rule 10b–5 (Count III)* [30]

■ Making general reference to Complaint ¶¶ 1–173, Count III ¶ 179 alleges:

As part of the organization and operation of APM and Compass commodity pools, either acting as principal or as aiders and abettors, or as controlling persons, and on or about September 1, 1987, October 1, 1987, December 23, 1987, March 31, 1988, January 31, 1989, August 1, 1989, and March 31, 1990, Coopers & Lybrand, Mahlmann, or Bogner, or Egan, or Howard Stotler, or Robert Stotler or Ciaglia, or Zarcone, or Kolter, or Dolkart, or R.G. Dickinson & Co., or LaSalle St. Securities, or some or all of those defendants, issued false and materially incomplete Prospectuses and Offering Memorandums....

From a patient rereading of the initial 173 paragraphs it appears that Count III is grounded on Complaint ¶ 75, which alleges that on those same dates (except for March 31, 1990 [31]) "Stotler Funds and/or APM issued certain Disclosure Documents" that falsely described the intended use of pool funds.[32]

Count III clearly fails under Rule 9(b). Uncertain in its description even as to whether Advanced or S Funds issued the assertedly tainted documents, the Complaint obviously fails to indicate whether and in what capacity the various defendants may have been involved in the preparation and distribution of those documents. Because of the complex and varying analyses required to establish liability for principals, control persons (discussed below) and aiders or abettors under 1934 Act § 10(b), neither defendants nor this Court can readily decipher Count III in its current form.

Nonetheless, in light of the already-discussed considerations surrounding Rule 9(b) and the fact that plaintiffs may be unable to specify defendants' various roles

---

**29.** That is true despite the fact that, as Dickinson Mem. 9 correctly argues, plaintiffs' conclusory allegations that Dickinson received the funds "with full knowledge that they came from Compass and APM" (¶ 87) or that those events "would have been reported to the Executive Committees and Boards of Directors of ... R.G. Dickinson" (¶ 90) do not contribute to the inference.

**30.** As with the CEA, this opinion will refer to sections of the 1933 and 1934 Acts by their internal numbering, again to be consistent with common usage.

**31.** March 31, 1990 is among the dates listed in Complaint ¶ 112, which refers to false and misleading Forms 1–FR. That reference is apparently not relevant to Count III, which refers only to disclosure documents and "offering memorandums."

**32.** Although Complaint ¶·179 refers to both Compass and Advanced, its only apparent referent, Complaint ¶ 75, pertains to Advanced alone.

with particularity until they have access to information that resides solely with defendants, this Court will not now dismiss Count III. Instead it will defer ruling on that count pending further discovery. Plaintiffs will also need to deal adequately with the pleading of scienter and a duty to disclose in order to state a claim for either primary or secondary liability under 1934 Act § 10(b) (see e.g., *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943–47 (7th Cir.1989), *DiLeo*, 901 F.2d at 627–29, *Robin*, 915 F.2d at 1126–27 and *Ackerman v. Schwartz*, 947 F.2d 841, 845–48 (7th Cir.1991)).

*1933 Act § 12(2)*

1933 Act § 12(2) provides that any person who:

> offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact
>
> . . .
>
> shall be liable to the person purchasing such security from him. . . .

*Pinter v. Dahl*, 486 U.S. 622, 642–47, 108 S.Ct. 2063, 2076–78, 100 L.Ed.2d 658 (1988) teaches that the coverage of related 1933 Act § 12(1) is not limited to strict buyer-seller privity. In addition to those who actually pass title, persons who solicit the purchase and are "motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner" (*id.* at 647, 108 S.Ct. at 2078) are potentially liable. And *Ackerman*, 947 F.2d at 844–45 has applied the identical analysis to the comparable language in 1933 Act § 12(2), a question as to which *Pinter* had reserved ruling (486 U.S. at 642 n. 20, 108 S.Ct. at 2076 n. 20).[33]

On the other hand, *Ackerman*, 947 F.2d at 845 (conforming to the ruling in *Pinter*, 486 U.S. at 648–54, 108 S.Ct. at 2079–82 as to the scope of 1933 Act § 12(1)) has held that 1933 Act § 12(2) does not extend to every person whose participation was a "substantial factor" in bringing about the transaction. Specifically, the statute does not cover "securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services" and whom "[t]he buyer does not, in any meaningful sense, 'purchas[e] the security from'" (*Pinter*, 486 U.S. at 651, 108 S.Ct. at 2080; accord, *Ackerman*, 947 F.2d at 845). Finally, while 1933 Act § 15 extends liability to persons who "control" an offeror or seller liable under 1933 Act § 12, there is no aider or abettor liability under the latter section (*Ackerman, id.*).

Complaint ¶ 182 attempts to state a 1933 Act § 12(2) claim against all defendants for two separate sets of transactions:

> (i) the sale of the limited partnership interests to plaintiffs and (ii) the purchase and sale of the Commercial Paper and the Promissory Note in December, 1989 and thereafter, to the plaintiffs by the use of the mails and instruments of interstate commerce, by means of a prospectus and/or oral communication which included untrue statements of material facts, and/or omissions of material facts. . . .

These two sets of sales and purchases require separate consideration.

▉ As for the initial sale of the partnership interests, plaintiffs have failed to state a 1933 Act § 12(2) claim against any defendant for either primary or controlling person liability. Though the latter capacity requires more discussion than the former, the result is equally clear as to both.

As for the primary-violator possibility, LaSalle and Dickinson are the only defendants potentially liable in that respect: They are the only defendants who allegedly offered or sold limited partnership interests in Compass or Advanced (¶¶ 27, 39). But in its July 25, 1991 class certification opinion in this case, 1991 WL 154460, at * 2, 1991 U.S. Dist. LEXIS 10384, at *5–6, this Court refused to certify a class against Dickinson and LaSalle as to Count IV because the Complaint does not assert that either of the

---

**33.** Further citations to *Pinter* should be understood as being drawn from its treatment of 1933 Act § 12(1) but as having been imported by *Ackerman* into the 1933 Act § 12(2) analysis.

named plaintiffs purchased his partnership interests from either Dickinson or LaSalle. That being so, Count IV is brought against Dickinson and LaSalle on behalf of Davis and McCall only, and it fails to state a claim against those defendants as primary violators for the same reason that a class could not be certified: There is no allegation that Dickinson or LaSalle offered or sold any interests to Davis or McCall.

▮ Plaintiffs' 1933 Act § 12(2) claims against the various defendants as controlling persons under 1933 Act § 15 also fail.[34] First, the Rule 9(b) problem already discussed as to Count III also plagues Count IV. Nothing in the Complaint specifies which of the various involved corporations or individuals, other than Dickinson and LaSalle, actually offered or sold the Advanced and Compass interests. Without knowing who the primary violators are, it is of course unclear whom the defendants were allegedly "controlling" so as to establish secondary liability under 1933 Act § 12(2).

▮ Even if that were clear, however,[35] plaintiffs have failed to provide a basis for inferring that any one or more of the defendants were in fact controlling persons of any of the corporate entities or of each other. Although our Court of Appeals has not specified an express standard for establishing controlling person liability, it has indicated some minimum requirements: Defendant (1) must have participated in the operations of the primary violator in general and (2) must have "possessed the power to control the specific transaction or activity upon which the primary violation is predicated" (*Schlifke*, 866 F.2d at 949, quoting *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985)). To much the same effect, *Bark-*

*er v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir.1986) (emphasis in original, and also citing *Metge*) has said of 1934 Act § 20(a), the provision parallel to 1933 Act § 15:

> This provision is applicable only to people who actually exercised control over the issuers, sellers, and other people directly liable.... [C]ontrol ... almost always means the practical ability to *direct* the actions of the people who issue or sell the securities.

Although plaintiffs have specified which positions the individuals defendants held in the various corporate entities, they have alleged no other facts to support an inference of "control." Several district courts have agreed that allegations regarding organizational status do not by themselves establish control under *Schlifke* (*Mancini v. Prudential–Bache/Fogelman Harbour Town Properties, L.P.*, No. 90 C 5213, 1991 WL 171966, at * 8, 1991 U.S. Dist. LEXIS 12212, at *25–26 (N.D.Ill. Aug. 30, 1991); *Koplin v. Labe Fed. Sav. & Loan Ass'n*, 748 F.Supp. 1336, 1341–42 (N.D.Ill.1990); *Craig v. First Am. Capital Resources, Inc.*, 740 F.Supp. 530, 537 (N.D.Ill.1990); *Pershing Division v. Sirmer*, No. 89 C 2239, 1989 WL 165155, at * 5–6, 1989 U.S. Dist. LEXIS 15642, at *15–17 (N.D.Ill. Dec. 27, 1989)). Thus plaintiffs' allegations that the various defendants were either "principals," officers or directors of S Funds or any of the other corporate entities (¶¶ 29.b, 30–32, 37–38) do not suffice to establish controlling person liability. Neither, of course, do their conclusory allegations about claimed controlling person status (¶¶ 33, 41, 152). Plaintiffs have therefore failed to state a 1933 Act § 12(2) claim in

---

34. That latter section provides:
 Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k [1933 Act § 11] or 77l [1933 Act § 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless

the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

35. It might be, for example, that S Funds was indeed an offeror or seller based on Complaint ¶¶ 68, 70 and 74–76, which allege that S Funds prepared and issued the prospectuses and disclosure documents for the pools.

connection with the sale of the limited partnership interests.

■ As to the second set of transactions, the sale of the commercial paper and promissory note, plaintiffs lack standing to pursue a 1933 Act § 12(2) claim. As already stated, that statute applies to buyer-seller (or buyer-offeror) relationships—or to the closely-related situations that have been described in *Pinter* and its 1933 Act § 12(2) progeny. Here the buyers of the promissory note and commercial paper were Advanced and Compass, not the individual investors who now sue. Any securities law right of action that might be based on those sales belongs to Advanced and Compass. Because this lawsuit has not been brought as a derivative action on behalf of the partnerships themselves, the individual investors cannot pursue the claim.

■ In addition, even if the investors themselves could have pursued such a claim, the promissory note and commercial paper transactions clearly do not come within the protection of 1933 Act § 12(2). No false or misleading prospectuses or oral communications were transmitted from the sellers to the buyers in those transactions. Quite the contrary is true: According to plaintiffs' own theory, the buyers and sellers in those transactions were all privy to the same fraudulent scheme. Any fraudulent communications that may later have been sent to plaintiffs about those transactions were not part of the transactions themselves and therefore do not come within the scope of 1933 Act § 12(2).

Complaint Count IV is therefore dismissed. Insofar as Count IV is based on the initial sale of the partnership interests, that dismissal is without prejudice for the same reasons that have been spelled out as to Count III.[36] Any possible future reassertion of the claim would have to specify (1) who offered or sold the partnership interests and (2) in what way the other defendants controlled those entities and the

fraudulent activity that surrounded the sales.

### *1933 Act § 11 (Count V)*

■ 1933 Act § 11 provides a cause of action to securities purchasers who allege that a registration statement contained false or misleading information. Lacking the 1934 Act § 10(b) scienter requirement, 1933 Act § 11 claims are more easily pleaded—but that is offset by the fact that such claims may be brought only against a limited class of defendants (*Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983); *Barker,* 797 F.2d at 495). Those include directors and partners of the issuer, signatories of the registration statement, underwriters and professionals (including accountants) who are named as having prepared any part of the registration statement.

Count V names all of the individual defendants and Coopers as targets for 1933 Act § 11 liability (¶ 185). Complaint ¶¶ 68 and 69 allege that in conjunction with its issuance of the Compass limited partnership interests, S Funds filed a Form S–18 Registration Statement that was signed by Egan, Kolter, Howard and Bogner and included financial statements prepared by Coopers. Complaint ¶ 29.b specifies that Egan, Mahlmann, Robert, Howard and Bogner were directors of S Funds. Complaint ¶ 71 says this about the allegedly fraudulent statements:

> The Registration Statement and Prospectus and the Accountant's Reports included therein were intentionally or recklessly false and materially misleading and incomplete in that they included false statements that Compass would make no loans with investor proceeds and that the Partnership would not buy any securities with Partnership assets other than those authorized for customer's funds by the CEA, and in that they omitted to disclose material facts relating to the financial instability of Stotler Funds, Stotler and

---

**36.** Although Count III has been kept in the case pending future discovery, Count IV is much more problematic for the reasons that have been discussed in the text—hence the difference in disposition.

Company, Stotler Group, and their affiliates, all as alleged herein.

Thus the registration statement was purportedly false and misleading in two respects:

1. It stated that Compass would not make loans or use funds for purposes other than commodities trading.

2. It failed to disclose Stotler's financial problems.

With respect to alleged misrepresentations, Rule 9(b) requires that pleadings must state the "specific content of the false representations" (*Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago*, 927 F.2d 988, 993 (7th Cir.1991)) and must "specify why that statement is fraudulent" (*Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 818 (7th Cir.1987)). What plaintiffs have described as the first alleged inaccuracy satisfies the requirements of Rule 9(b), for it appears to refer to particular statements in the documents.[37] But the second alleged failure—the omission of disclosure as to the financial instability of the various Stotler entities—is not stated with sufficient particularity. To comply with Rule 9(b) plaintiffs must specify what material facts were omitted or in some other way indicate why

the description of Stotler's financial situation was misleading.

Because the first allegation is sufficient, plaintiffs have succeeded in stating a 1933 Act § 11 claim against Egan, Mahlmann, Kolter, Robert, Howard, Bogner and Coopers.[38] While Ciaglia and Zarcone might potentially be liable under the statute as controlling persons of S Funds, the Complaint fails to establish such a basis for liability (as already discussed in connection with 1933 Act § 12(2)). Count V is therefore dismissed against Ciaglia and Zarcone, but without prejudice.

### RICO (Counts VI and VII)

RICO § 1964 [39] provides a civil cause of action for individuals injured by violations of RICO § 1962. Plaintiffs here state their claim, apparently against all defendants, under Section 1962(c) [40] by alleging "conduct of the enterprises' affairs through a pattern of racketeering activity" (¶ 190).

■ It is hardly necessary to rehearse the full history of the "pattern" requirement (even if it were possible to do so in less space than a picaresque novel would occupy). This Court was one of the first

---

**37.** This opinion has said at the very outset that it is premised (as every Rule 12(b)(6) ruling must be, see n. 2) on the assumption that the Complaint has portrayed the facts accurately. But that point bears repetition—indeed, special emphasis—here. To establish 1933 Act § 11 liability, plaintiffs must prove that defendants' challenged representations were false *when they were made*, and not merely that later events turned out differently from defendants' initial statement of their future intentions. Thus a later-broken promise (in this instance, the assurance that pool funds would be used only for commodities trading) is not actionable as securities fraud unless defendants intended right from the beginning to break that promise. Needless to say, this opinion carries no implication that plaintiffs will be able to meet that burden of proof.

**38.** Although the charge against Coopers is being upheld at this time, Cooper's putative liability is actually somewhat unclear. 1933 Act § 11(a)(5) specifies that accountants (and other professionals) may be liable only "with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him." That means Coo-

pers is potentially liable only for those portions of the registration statement that it prepared (see ¶ 69). As it is currently structured, Complaint ¶ 71 indicates that Coopers' reports included statements about the potential use of pool funds as well as misstatements regarding Stotler's financial instability. If in fact Coopers' reports included only the latter misstatements, Coopers will be dismissed from Count V unless those misstatements are repleaded with the required specificity as discussed in the text.

**39.** As to RICO, unlike the other statutes called into play by plaintiffs, the most common usage employs the section numbering in Title 18 rather than the statute's internal numbering. This opinion will do the same, citing to "RICO § —" without referring to Title 18.

**40.** Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

804

voyagers to embark on what was then an uncharted sea—and the familiar sealanes that later wended their path through the now-famous (notorious?) footnote 14 in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985) and then found their way once again into the Supreme Court's waters in *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237–49, 109 S.Ct. 2893, 2899–906, 106 L.Ed.2d 195 (1989) are by now well known to everyone. Though the characterization seems to raise as many questions as it resolves, by now it is old hat that two factors—"relationship" and "continuity"—are necessary to establish a pattern of racketeering activity.[41]

■ As for the relatively straightforward "relationship" element, *United States Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1266–67 (7th Cir.1990), quoting 18 U.S.C. § 3575(e) (as had *H.J.*, 492 U.S. at 240, 109 S.Ct. at 2901) explains:

Predicate acts are related if they have "the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

Plaintiffs' allegations clearly satisfy that requirement. In this instance the alleged predicate acts of securities, mail and wire fraud[42] all had the same purpose (diverting partnership funds to deal with Stotler's financial difficulties), the same results (loss of plaintiffs' funds), the same methods of commission and the same participants and victims.

It is the second component—the "continuity" prong of the pattern requirement—that brings about plaintiffs' RICO failure. And that is scarcely surprising: Failure to establish continuity has generally been the downfall of RICO claims in this Circuit, especially since the Supreme Court focused on that element in *H.J.* (see, e.g., *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d

**41.** When this Court began this section of the opinion with a strong sense of (as Yogi Berra put it) "deja vu all over again," it actually contemplated writing an appendix that would recapitulate briefly its own travels through the RICO seas from the time that they were almost wholly unknown and shoal-ridden. When a LEXIS search turned up almost exactly 100 of this Court's opinions in the civil RICO area, however, that project of course went by the boards. What this Court did find striking, though, given the checkered judicial history of the statute, was the fresh look that it took at its first treatment of the "pattern" issue following *Sedima*. *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828 (N.D.Ill.1985) was the first reported decision by any court after the Supreme Court had spoken in *Sedima*, so that this Court accurately said (*id.* at 833):

*Sedima* thus clearly creates a whole new ballgame. With such an unmistakable signal from the Supreme Court, this Court is no longer obligated to follow contrary Court of Appeals opinions.

As it turned out, *Inryco* ultimately and quite unwittingly gave rise to some unintended mischief: Early on it was found persuasive by the Eighth Circuit in *Superior Oil Co. v. Fulmer*, 785 F.2d 252, 257 (8th Cir.1986), and that court then went on in later cases to extend its restrictions on the "pattern" concept in an impermissible way (well beyond the approach that this Court took in *Inryco* and its own later cases). That overly constricted Eighth Circuit reading of the statute was ultimately corrected only by the

Supreme Court's reversal of that Court of Appeals in *H.J.* But to return to this Court's *Inryco* opinion, it accurately found that some earlier Seventh Circuit decisions that had equated two or more racketeering acts with a "pattern," based only on the relatedness of those acts and not on the concept of continuity as well, did not survive *Sedima*. This Court therefore said (615 F.Supp. at 831 (emphasis in original)):

In logical terms, such cases as [*United States v.*] *Starnes* [644 F.2d 673 (7th Cir.1981)] and [*United States v.*] *Weatherspoon* [581 F.2d 595 (7th Cir.1978)] were only partly right in fleshing out the concept of "pattern." True enough, "pattern" connotes similarity, hence the cases' proper emphasis on relatedness of the constituent acts. But "pattern" also connotes a multiplicity of events: Surely the continuity inherent in the term presumes repeated criminal *activity*, not merely repeated *acts* to carry out the *same* criminal activity. It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a "pattern of racketeering activity."

That is exactly what *H.J.* established definitively four years later, and it aptly summarizes the results of the painstaking survey that forms the remainder of this section of the current opinion.

**42.** Because it turns out that plaintiffs have failed to establish a RICO pattern even if it were assumed that all of the predicate claims have been sufficiently stated in Rule 9(b) terms, it is not necessary to make that determination.

815, 820–21 (7th Cir.1991); *United States Textiles,* 911 F.2d at 1267–69; *Olive Can Co. v. Martin,* 906 F.2d 1147, 1151–52 (7th Cir.1990); *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.,* 883 F.2d 48, 50–51 (7th Cir.1989); and *Sutherland v. O'Malley,* 882 F.2d 1196, 1204–05 (7th Cir.1989)).

At its core the continuity element relates to the fact that "Congress was concerned in RICO with long-term criminal conduct" (*H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902). As *United States Textiles,* 911 F.2d at 1267 (quoting *H.J.,* 492 U.S. at 240–41, 109 S.Ct. at 2901–02, emphasis in original) puts it:

> "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." The rather amorphous concept of "continuity" was defined by the Court in *H.J. Inc.* as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."

*H.J.* does not provide any general test for evaluating continuity, but reasons instead that "[w]hether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case" (492 U.S. at 242, 109 S.Ct. at 2902; see also *J.D. Marshall,* 935 F.2d at 820; *Sutherland,* 882 F.2d at 1204). Our Court of Appeals continues to rely (at least nominally, see, e.g., *J.D. Marshall,* 935 F.2d at 820; *Sutherland,* 882 F.2d at 1204) on these factors that it first articulated in *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986) as the focus for the fact-based analysis:

> the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries.

Because of the fact-specific nature of the continuity inquiry, however, those factors do not provide a precise standard (*J.D. Marshall,* 935 F.2d at 820–21), nor is any one factor determinative (*Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1277 (7th Cir. 1989), a pre-*H.J.* decision). Instead, especially in light of *H.J.,* the factors must be analyzed "with an eye towards achieving a 'natural and common sense' " resolution of the ultimate issue—whether the predicate acts amount to "long-term criminal conduct" (*United States Textiles,* 911 F.2d at 1267, quoting *H.J.,* 492 U.S. at 237, 109 S.Ct. at 2899).

Here the RICO claim assertedly rests on numerous predicate acts (mail, wire and securities fraud) that extended over at least a year and a half [43] and that certainly impacted numerous victims. Those acts were part of a single scheme and caused one distinct injury to each of Compass and Advanced, the loss in value of the partnership interests (though to be sure that loss in value harmed a great many individual investors). Although such a claimed multiplicity of predicate acts and victims may at first glance appear to reflect continuity, it is clear when all of the factors are viewed together that they do not paint a picture of continuing criminal activity.

First, it is well established that acts of mail and wire fraud, no matter how numerous, do not themselves contribute to a finding of continuity—at least where they really involve a single course of criminal activity (see, e.g., *United States Textiles,* 911 F.2d at 1268; *Sutherland,* 882 F.2d at 1205 n. 8; *Hartz v. Friedman,* 919 F.2d 469, 473 (7th Cir.1990); *Ashland Oil,* 875 F.2d at 1278–79). *United States Textiles,* 911 F.2d at 1268 recently requoted this language from Judge Cudahy's concurrence in *Lipin Enterprises v. Lee,* 803 F.2d 322, 325 (7th Cir.1986), which has found its way into a substantial number of Seventh Circuit opinions:

> Mail fraud and wire fraud are perhaps unique among the various sorts of "racketeering activity" possible under RICO in that the existence of a multiplicity of

---

**43.** That facet of the claim is very doubtful. After all, the looting of the commodities pools that is ascribed to the Stotler entities had involved only a few transfers that had ended well before the further decline of the Stotler empire led to its ultimate collapse.

predicate acts ... may be no indication of the requisite continuity of the underlying fraudulent activity. Thus, a multiplicity of mailings does not necessarily translate into a "pattern" of racketeering activity.

Because all of the incidents of mail and wire fraud in that case related back to one underlying act of extortion, *United States Textiles, id.* thus held in a situation much like the one alleged by plaintiffs in this action:

Under these circumstances, we believe that the raw number of transactions and the length of time over which those transactions occurred was pure happenstance in light of the underlying concern which is the "continuity" of the criminal activity.

As in *United States Textiles,* all the predicate acts here relate back to an underlying act (or at most two acts, if so viewed): the transfers of funds from Compass and Advanced to Dickinson. Those transfers, which are the assertedly fraudulent activity actually at issue, occurred within one week, apparently in response to a crisis situation. Thus the large number of claimed predicate acts (whatever they may be) that stem from those transfers do not support an inference that fraud was defendants' ordinary way of doing business.

It is equally obvious that the large number of victims is similarly incidental in terms of the continuity requirement. All plaintiffs were injured simultaneously when the funds were transferred. Just because many individuals—the plaintiff investor classes—were harmed by those transactions, that does not in any way imply that the alleged fraud was the defendants' normal way of doing business or that there were other Stotler victims "waiting in the wings" (*United States Textiles,* 911 F.2d at 1269).

Such irrelevance of the large numbers of predicate acts and victims becomes clear when they are viewed in light of the last two *Morgan* factors. First, despite the multiplicity of predicate acts and victims, the alleged fraud was part of a single scheme. Although *H.J.* held that multiple schemes were not necessary to establish a RICO pattern, "it is not irrelevant, in analyzing the continuity requirement, that there is only one scheme" (*Sutherland,* 882 F.2d at 1204; see also *United States Textiles,* 911 F.2d at 1269).

At least as importantly, plaintiffs suffered only one distinct injury as a result of the scheme: the loss in value of their limited partnership interests when defendants transferred the pool funds to Dickinson in exchange for the allegedly worthless commercial paper and promissory note. As plaintiffs have themselves acknowledged (¶ 98):

However, the Promissory Note issued to APM and the Commercial Paper issued to Compass were in fact of substantially reduced value from at or near the date of their issuance because of the continued and increasing financial difficulties of Stotler Group and Stotler and Company. Thus, from virtually the dates that the funds of APM and Compass were unlawfully converted as described, the $5.55 million in funds were partially if not totally lost to the investors of the two pools.

For that reason alone, plaintiffs were not separately harmed each time thereafter that they received a statement that was false or misleading in regard to that transfer. Those facts are even less indicative of continuity than were the facts in *United States Textiles,* which found that no continuity existed. There the plaintiffs did suffer a unique injury each time over a two-year period that they shipped products to defendants under a contract that had been achieved through extortion. *United States Textiles,* 911 F.2d at 1269 nonetheless held that the injuries were not distinct because of the fact that they all related back to the same act of extortion and did not therefore indicate "continuing" criminal activity:

If the concern is "continuity," however, and the price for that "continuity" is treble damages, costs and reasonable attorneys fees, *see* 18 U.S.C. § 1964, a natural and common sense approach to the pattern element of RICO would instruct that identical economic injuries suffered

over the course of two years stemming from a single contract were not the type of injuries which Congress intended to compensate via the civil provisions of RICO.

In the same way, the large number of victims does not contribute to a finding of continuity because the victims did not suffer distinct injuries. In *Elliott v. Chicago Motor Club Ins.*, 809 F.2d 347, 350 (7th Cir.1986) five individuals were harmed by fraud related to the settlement of a single insurance claim. Again the Court of Appeals found that there was no RICO pattern despite the fact that there were multiple victims, because their injuries all arose out of the same claim and were therefore not distinct. *Jones v. Lampe*, 845 F.2d 755, 758 (7th Cir.1988) similarly found no RICO pattern when four victims suffered one distinct injury that arose from a single transaction, the wrongful conversion of loan proceeds. Those cases as well as the present one form a sharp contrast with the pre-*H.J.* decision in *Ashland Oil*, 875 F.2d at 1279, which found a RICO pattern when each of several plaintiffs was separately injured by different predicate acts.

Perhaps most instructive is *Olive Can*, a post-*H.J.* case that found no RICO pattern under facts very similar to those now before this Court. As in this case, *Olive Can* involved a single fraud scheme that was engineered to deal with a financial crisis and that involved numerous predicate acts and multiple victims. *Olive Can*, 906 F.2d at 1152 held that those facts did not establish continuity because "[i]n essence, the activities of the defendants were to effectuate a single, short-term goal" and there was no evidence that the scheme would continue after that goal was achieved. As in *Olive Can*, plaintiffs here have not provided any evidence that defendants were "in the business of stealing money" (as *Olive Can, id.* characterized the defendants in *Ashland Oil*) or that their actions were anything other than a one-time attempt to deal with a financial crisis.[44] To the contrary, plaintiffs themselves have urged (¶ 90):

> The regulatory deficiencies of R.G. Dickinson and the transfers of such large amounts of pool funds were corporate events which were substantially out of the ordinary course of the regular business of Stotler Funds, Stotler Group and R.G. Dickinson.

In sum, plaintiffs' RICO § 1962(c) claim in Count VI must be and is dismissed. And because plaintiffs have failed to establish a RICO pattern, Count VII's claim of an alleged conspiracy in violation of RICO § 1962(d) is also dismissed.

### State Law Claims

Because the original complaint here was filed on December 11, 1990, this case comes under the then-recently-enacted supplemental jurisdiction statute, 28 U.S.C. § 1367(a):[45]

> In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental juris-

---

**44.** *Olive Can* distinguishes itself from *Ashland Oil*, which also involved numerous predicate acts and multiple victims and which found that continuity had been established. In addition to the fact that *Ashland Oil* predated *H.J.*'s emphasis on the threat of continued criminal activity, *Olive Can*, 906 F.2d at 1152 emphasized that *Ashland Oil* involved various types as well as a large number of predicate acts (bankruptcy fraud and arson, as well as mail and wire fraud). It concluded that those acts could reasonably have indicated that the fraud was more than a one-time activity (*id.;* see also *Ashland Oil*, 875 F.2d at 1279). In addition, the *Ashland Oil* defendants were not responding to a one-

time financial crisis, but had implemented a plan for their own individual financial enrichment that did not have an obvious end point. That gave rise to an inference that the defendants were "in the business of stealing money" and might have continued their activity indefinitely (*Olive Can*, 906 F.2d at 1152, distinguishing *Ashland Oil*, 875 F.2d at 1272). As in *Olive Can*, such indications of continuing activity are not present here.

**45.** That statute applies to all actions filed after December 1, 1990.

diction shall include claims that involve the joinder or intervention of additional parties.

Because that provision embraces pendent-party as well as pendent-claim jurisdiction, it is not necessarily fatal to plaintiffs' state law claims that some of the defendants may no longer be subject to any federal claim.

 Even the expansive new statute, however, is still subject to Article III's constitutional limits. It applies only to supplemental claims that form part of the "same case or controversy." That determination is still informed by *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), which states that claims are part of the same case or controversy if they "derive from a common nucleus of operative fact" and "are such that [the plaintiff] would ordinarily be expected to try them all in one judicial proceeding...."

It is not wholly clear whether that standard is satisfied under the federal claims that remain at this time. Those claims involve only two relatively narrow issues: misstatements in the Compass registration statement and any fraud that Dickinson may have committed. And as this opinion reflects, the dust has not yet settled on the identification of *all* of plaintiffs' federal claims. Accordingly, rather than determining at this time whether or not the state law claims and the parties that they implicate are sufficiently related to the federal claims to establish supplemental jurisdiction, this Court will defer ruling on defendants' motions to dismiss those claims until the scope of the remaining federal case is more clearly established.

### Conclusion

Plaintiffs' CEA claims are dismissed against all defendants except for Dickinson, which is potentially liable only under CEA § 4*o*. Ruling is deferred on plaintiffs' 1934 Act § 10(b) claim pending further discovery. Plaintiffs' 1933 Act § 12(2) claims are dismissed against all defendants, though in part without prejudice.

**46.** See Appendix.

Their 1933 Act § 11 claims are dismissed in part against all defendants and in their entirety against Ciaglia and Zarcone, but again such dismissals are without prejudice. Both RICO counts are dismissed. Finally, ruling on the supplemental state law claims is deferred pending further definition of the federal claims.[46]

### APPENDIX

One of the surprises of exercising the judicial function is the frequency with which the phenomenon of serendipity exhibits itself. It is truly extraordinary just how often, for example, this Court's weekly reading of authorities deriving from a host of sources—our Court of Appeals' slip opinions, or *United States Law Week*, or the opinions from other District Courts in the Seventh Circuit as reported in the F.Supp. and F.R.D. advance sheets, or West's *Federal Case News* or the Illinois Decisions advance sheets—turns up a case that is directly relevant to an issue posed in a pending motion in a case on this Court's calendar that is either fully briefed or in the briefing process.

Serendipity has struck again, this time in the simultaneous involvement of this Court's two first-rate law clerks in the preparation of bulky draft opinions each of which is outside the range of most of this Court's opinions in scope and complexity. In this case, for example, any law clerk who is exposed to the arcane mysteries of RICO and its "pattern" requirement (necessarily for the first time) must perforce engage in massive efforts to acquire the degree of understanding that is needed to resolve the application of that requirement to the situation here—something that by definition poses fewer problems for someone such as this Court who has had to live through the formative years of civil RICO (a subject also dealt with in this opinion).

Moreover, this case (like the one that has absorbed this Court's other law clerk during the same time frame) involves not only a whole panoply of issues posing extraordinary difficulty but also the presence of

several sets of defense counsel, each of whom has naturally (and properly) focused on the issues relating to his, her or its respective clients. And as this Court has just within the past few days said in a similar appendix added to its opinion in that other case, that additional factor creates for the law clerk the extra level of complexity of having to organize the total treatment of the already complex legal issues into a coherent whole.

All this is a prelude to acknowledging the splendid work of this Court's law clerk, Ms. Karen Wiviott, in generating the draft opinion that has ultimately led to the issuance of the opinion to which this appendix is annexed. Having said that, this Court must add the point that it always makes when it has this kind of occasion to pay tribute to the outstanding work of one of its uniformly outstanding law clerks: Every draft opinion submitted by a law clerk is reviewed and reworked sentence by sentence (indeed, word by word) by this Court, and as part of that process this Court also reads every one of the authorities that is cited in each of its opinions. If then there is anything to find fault with in this or any other completed opinion, that fault is ascribable to this Court and not to the fine work of its clerks.