**WHIRLPOOL· FINANCIAL CORPORATION,**
**Plaintiff,**

v.

**GN HOLDINGS, INC., etc.,**
**et al., Defendants.**

No. 94 C 4192.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 6, 1995.

Roy M. Van Cleave, Jonathan G. Bunge, John F. Young, Chicago, IL, for plaintiff.

Mark E. Ferguson, Mark L. Levine, Matthew F. Kennelly, Chicago, IL, for defendants.

1. Because Whirlpool's federal claims are not insubstantial or frivolous, defendants' Rule 12(b)(1) attacks on this Court's subject matter jurisdiction will be treated as Rule 12(b)(6) motions instead (*Malak v. Associated Physicians, Inc.*, 784 F.2d

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Whirlpool Financial Corporation ("Whirlpool") has sued GN Holdings, Inc. ("GN"), W.R. Grace & Co.—Conn. ("Grace"), Kevin ("Kevin") and Michelle Clark (collectively "Clarks") and Robert ("Robert") and Diane Bok (collectively "Boks") to rescind Whirlpool's $10 million loan to GN. Because that transaction involved the "sale" of GN's $10 million note to Whirlpool for securities laws purposes, Whirlpool brings its claim under the Securities Exchange Act of 1934 ("1934 Act") (Count I), the Illinois Securities Law of 1953 ("Illinois Act") (Count II) and the Securities Act of 1933 ("1933 Act") (Count III).

All defendants have filed motions to dismiss under Fed.R.Civ.P. ("Rule") 9(b), Rule 12(b)(1) and Rule 12(b)(6).[1] Clarks and Boks have also moved for dismissal under Rule 12(b)(2). For the reasons stated in this memorandum opinion and order, the Rule 12(b)(6) motions are granted (so that the other motions are rendered moot) and both the Complaint and this action are dismissed.

### Legal Standards

As to the current motions, familiar principles applicable to both Rule 9(b) (*Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1278 (D.C.Cir.1994)) and Rule 12(b)(6) (*Thompson v. Boggs*, 33 F.3d 847, 852 (7th Cir.1994)) require this Court to accept as true all of Whirlpool's well-pleaded factual allegations, drawing all reasonable inferences in its favor. No defendant's motion to dismiss should be granted unless no relief could be granted under any set of facts that could be proved consistent with those well-pleaded allegations (*Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

### Parties to the Litigation

Whirlpool engages (among other activities) in commercial lending (Complaint ¶ 5). GN

277, 279–80 (7th Cir.1986)). That obviates any need for the resolution of any disputed facts (as might be required under Rule 12(b)(1), while it is inappropriate under Rule 12(b)(6)).

(formerly CCHP Delaware, Inc.,[2] *id.* ¶ 6) had been wholly owned by Grace until mid-July 1991 (*id.* ¶ 7). On July 15, 1991 Grace, Clarks and Boks entered into a Shareholders Agreement ("Agreement," Complaint Ex. E) pursuant to which each of the four individuals acquired 12.75% of GN's common stock (a total of 51%) (*id.*) and Kevin and Robert were elected directors of GN along with two individuals named by Grace and a fifth (independent) director (Complaint ¶ 22). Kevin was named GN's President, Chief Executive Officer and Treasurer (Complaint ¶ 23).

### Whirlpool–GN Transaction

This lawsuit stems from Whirlpool's asserted reliance on false financial projections in making a $10 million subordinated loan to GN in July 1991. That loan is evidenced by a Subordinated Term Note (Complaint ¶ 6 and Ex. A) calling for quarterly payments of interest only, with the entire principal to be repaid in 1998 (Complaint ¶ 26). GN used the loan proceeds to finance its purchase of the assets of the Clarks–Boks-owned Cross Country Healthcare Personnel, Inc. ("Cross Country") and an affiliated corporation (*id.* ¶¶ 14, 18) in what will here be termed the "Transaction."[3] At the same time (July 16, 1991) GN also secured additional financing from other sources (*id.* ¶ 24):

Loans
Heller Financial ("Heller") $40.3 million pursuant to a Senior Term Loan
 $ 4.5 million pursuant to a Revolving Loan

Preferred Stock
Grace $25.2 million for 252 shares

Common Stock
Clarks and Boks $510,000 for 51 shares
Grace $470,000 for 47 shares
Heller $ 20,000 for 2 shares

2. For clarity (and also because Complaint ¶ 6 does not indicate the specific date on which CCHP Delaware, Inc. amended its Certification of Incorporation to reflect its new name), this opinion refers only to "GN."

3. Though Complaint ¶ 14 refers to Cross Country's "four operating subsidiaries," the Transaction actually took the form of an asset acquisition encompassing the assets of Cross Country (including the stock of its three subsidiaries) and the assets of Assignment America, Inc. ("AAI"), a temporary personnel company affiliated with

Clarks and Boks had formed Cross Country in 1986 (*id.* ¶ 14). That corporation carried on its business through three operating subsidiaries engaged in providing hospitals with the services of long-term temporary registered nurses and licensed practical nurses (AAI also provided such services, Memorandum 1), physical therapists, occupational therapists, respiratory therapists and radiological technicians (Complaint ¶ 14). Before the Transaction Clarks and Boks had owned all of Cross Country's issued and outstanding stock and had served as the only directors of Cross Country and of each of its subsidiaries and AAI (*id.* ¶¶ 16, 17).

To assist in securing the financing for the contemplated Transaction, Lehman Brothers had worked with GN, Grace, Clarks and Boks in preparing a February 1991 Private Placement Memorandum ("Memorandum," Complaint Ex. C). That Memorandum, provided to Whirlpool during that same month (Complaint ¶ 18), included narrative information, historical financial data and projections for the business going forward. Originally the Memorandum valued the Transaction at $94.3 million plus a contingent payment of up to $9.1 million to Kevin (*id.* ¶ 19). Later, however, Grace, Clarks and Boks reduced the purchase price to $86.5 million (*id.* ¶ 20) and ultimately to $76.5 million, with Whirlpool's investment set at $10 million (*id.* ¶ 21). In the course of that restructuring the Memorandum's initial projections were revised downward via a rider ("Rider") provided to Whirlpool before it invested (*id.* ¶ 21).

Under the terms of the GN–Whirlpool Subordinated Loan Agreement, GN was to send Whirlpool monthly, quarterly and audited year-end financial statements, as well as periodic management reports (D.Ex. 1 at 50–57[4]). Though the Complaint makes no men-

Cross Country and owned by Clarks and Boks (Complaint Ex. C (the Memorandum referred to a bit later) at 1).

4. This Court may consider documents tendered by defendants when such documents are referred to in the complaint (*Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993)). GN's amended projections appear as Rider Schedule 4.3(C) to the Subordinated Loan Agreement, which is referred to in Complaint ¶ 26, thus clearly making that Agreement integral to Whirlpool's claim.

tion of whether GN complied with those obligations, Whirlpool does not allege otherwise—and in any event it soon learned that GN's net sales, operating profit, pretax profit, net income and earnings before interest, taxes, depreciation and amortization were all far below GN's projections, both from the outset and continuously thereafter (Complaint ¶ 40). Despite the ongoing dramatic shortfalls in every aspect of its financial results, GN nevertheless continued to meet its interest obligations to Whirlpool on a timely basis until it defaulted on the April 1, 1994 payment (*id.* ¶ 29). Whirlpool filed this action on July 11, 1994.

### Memorandum and Rider

Notwithstanding the Memorandum's great detail (it ran to 54 single-spaced pages plus appendices), its text was preceded by a 1½ page boldface statement that included a broad disclaimer of any express or implied representations or warranties as to the accuracy or completeness of the information contained in the Memorandum. That same page cautioned that the Memorandum's market analysis and financial projections represented inherently personal and subjective views of management and that there could be no assurance that management's perceptions were accurate or that the company would perform as projected. Those warnings were essentially reiterated at Memorandum 45:

> The projections for 1991 and 1992 have been prepared by Management in good faith based on assumptions which are believed to be reasonable, but no representations are made as to the accuracy of such assumptions. The estimates and assumptions underlying these projections are subject to economic and competitive uncertainties which are beyond the Company's control, and actual results may be higher or lower than those set forth in this memorandum.

Despite its initial (and later-repeated) hedges, Memorandum 2 went on to describe Cross Country as what Clarks and Boks believed to be "the largest, most respected and most imitated firm in the travel nurse industry." Citing the company's exceptional reputation with health care institutions na-

tionwide, its aggressive marketing and its ground-breaking technology, the Memorandum positioned Cross Country as an industry leader (*id.* 7–8). That industry was described both in terms of the temporary personnel industry generally (coupled with the nursing industry) and more specifically in terms of the travel-nurse segment of temporary personnel (*id.* 30–34).

Figures for the general temporary personnel industry had demonstrated an annual growth rate of 8.5% in the average number of temporary employees from 1986 to 1989 (*id.* 30). Memorandum 31 then went on to describe a growing nursing shortage and cited figures estimating that the demand for nurses would exceed the supply by more than 20% by the year 2000. That shortage, the Memorandum suggested, would pave the way for Cross Country to contract out the services of its professionals to alleviate the strain placed on health care providers. Memorandum 34 cited a study listing travel nursing "as one of the 25 hottest careers for the 1990s" and concluded that "[a]lthough there are no published statistics on the travel nurse industry, one industry observer estimates the size of the industry at approximately $350 million in 1990 and growing in excess of 20% per year."

That 20% annual growth projection in the "Industry Overview" had been exceeded by Cross Country's own figures presented in the "SUMMARY OF HISTORICAL FINANCIAL RESULTS AND PROJECTIONS" (Memorandum 6). Its revenues had increased from $9.7 million in the 1987 fiscal year to $30.3 million in 1988 and $51.8 million in 1989 (*id.*). Operating profits in those years had increased commensurately from $1.4 million in 1987 to $5.3 million in 1988 and $9.6 million in 1989 (*id.*). Extrapolating from those figures, the Memorandum predicted that Cross Country's operating profits would amount to $14.6 million in 1990 (adjusted pro forma to reflect the originally contemplated form of the Transaction) and would increase to $22.8 million in 1991 and $32.4 million in 1992 (*id.*). Those projections were based on the expressed assumption that the traveling nurse industry was "expected to experience continued rapid growth" due to

factors such as (1) the aging population, (2) increasing demands placed on nurses within hospitals, (3) the development of alternative health care delivery systems apart from traditional hospitals and (4) increased awareness that travel nurses provide a cost-effective way for hospitals to deal with varying seasonal occupancy levels (*id.* 7).

Having set out those optimistic figures, Memorandum 9 then presented the risks of the venture under the heading "Risk Factors," emphasizing that (1) the Company's continued success was dependent on Chief Executive Officer Kevin Clark, (2) the travel nurse industry was a relatively new one and its continued industry growth was uncertain, (3) the acquisition was highly leveraged and (4) there were potential malpractice liabilities. Most germane to the parties' present disputes is the following language on that page (emphasis in original):

> *The travel nurse industry is a relatively new one and continued industry growth is uncertain.*
>
> The travel nurse market is still in its development stages and there has been limited research conducted on its potential size and viability of the business. The success of the industry is contingent on nursing [sic] shortage. Although studies show that there is a current shortage of nurses in the U.S. and project that this shortage will continue in the foreseeable future, there are no assurances that this shortage will continue over an extended period of time. In addition, the Company's projected growth is dependent in part on its ability to recruit qualified nurses and other health care professionals. No assurance can be given that the Company will be able to retain and recruit the necessary nurses. *The acquisition is a highly leveraged transaction.*

The proceeds from the offering of the Senior Notes will be used to provide the debt financing for the acquisition. The Senior Notes are neither secured nor guaranteed. There can be no assurance that cash flow from future operations of the Company will be sufficient to meet its interest and principal obligations.

As indicated earlier in this opinion, on or after June 17, 1991—before Whirlpool made its decision to purchase the GN note—the Rider revised the projections in the Memorandum downward in recognition of new accounting principles to be adopted to reflect the asset acquisition (Complaint ¶ 21 and Ex. D). Net revenue projections were lowered from $115.5 million to $95.2 million for 1991 and from $162 million to $114.2 million for 1992. While Whirlpool concedes that those projections were "significantly less optimistic and, therefore, presumably more realistic" (Complaint ¶ 21), it points to the fact that discrepancies still remained between the Rider's projections and the ultimate reality as claimed evidence of securities fraud.

*Whirlpool's Complaint*

■ Count I of Whirlpool's Complaint asserts a claim under 1934 Act § 10(b)[5] in conjunction with the SEC's implementation of that section through its Rule 10b–5, 17 C.F.R. § 240.10b–5. To state a claim under Rule 10b–5, a plaintiff must allege that the defendant (1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (2) in connection with the purchase or sale of a security,[6] (3) with the intent to mislead, (4) causing plaintiff's loss (*Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989)).

**5.** This opinion employs the common usage of referring to sections of the 1933 and 1934 Acts by their internal numbering rather than by their numbering within Title 15 of the United States Code (as subparts of its §§ 77 and 78, respectively). And because many of the provisions at issue here are so familiar to practitioners, this opinion also finds it unnecessary to quote their language, opting instead to paraphrase their respective requirements. Finally, because the SEC has included no parentheses in labeling its Rule 10b–5, no confusion should be engendered by this opinion's use of "Rule" in citing both to that provision and to provisions of the Federal Rules of Civil Procedure.

**6.** "Security," as defined in 1934 Act § 3(a)(10), includes "any note ... but shall not include ... any note ... which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

Complaint Count II charges defendants with violations of the Illinois Act, 815 ILCS 5/1 to 5/19.[7] Illinois Act § 12 provides in relevant part:

It shall be a violation of the provisions of this Act for any person:

\* \* \* \* \* \*

F. To engage in any transaction, practice or course of business in connection with the sale or purchase of securities[8] which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

H. To sign or circulate any statement, prospectus, or other paper or document required by any provision of this Act knowing or having reasonable grounds to know any material representation therein contained to be false or untrue.

I. To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly.

Count III charges violations of 1933 Act § 12(2), which imposes liability on the seller or offeror of securities[9] whose prospectus or oral communication involves a material misrepresentation or a materially misleading omission. Unlike Rule 10b–5 actions, actions under 1933 Act § 12(2) have no scienter requirement (*Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385, 1391 (7th Cir.1990)).[10]

Each of the three Counts has an identical thrust, essentially set out in Complaint ¶ 38:

Defendants intentionally and knowingly prepared the Projections with misrepresentations and omissions of material facts, including false and misleading assumptions that were used in preparing the Projections.

With that completing the background, this opinion goes on to consider the legal sufficiency of Whirlpool's claims.

*Pleading Fraud with Particularity*

■ As a preliminary matter GN, Grace, Clarks and Boks claim that Whirlpool has failed to satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud ... shall be pleaded with particularity." They are mistaken.

■ Rule 9(b) compels a complaint that asserts fraud to identify the person making the representation and the time, place and content of the misrepresentation, as well as the method by which the misrepresentation was communicated to the plaintiff (*Katz v. Household Int'l, Inc.,* 36 F.3d 670, 675 (7th Cir.1994)).[11] Those requirements have been summarized as "the who, what, when, where, and how: the first paragraph of any newspaper story" (*DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990)). That contrasts sharply with the Rule 8(a)(2) standard calling only for "a short and plain statement of the claim showing that the pleader is entitled to relief" (Jeff Sovern, *Reconsidering Federal Civil Rule 9(b): Do We Need Particularized Pleading Requirements in Fraud Cases?,* 104 F.R.D. 143, 144–46 (1985)).

■ As this Court has noted elsewhere, the application of Rule 9(b) raises competing concerns (*Davis v. Coopers & Lybrand,* 787 F.Supp. 787, 792–93 (N.D.Ill.1992)). On the

---

7. Citations to the Illinois Act will omit the "815 ILCS 5/" preface, using the internal "§" designation instead.

8. [Footnote by this Court] Illinois Act § 2.1 defines a security to include "any note."

9. 1933 Act § 2(1) also includes "any note" in the definition of "security."

10. What has been said to this point scotches defendants' Rule 12(b)(1) subject matter jurisdictional challenge (see n. 1), because 1933 Act

§ 22(h) and 1934 Act § 27 expressly confer jurisdiction over Whirlpool's claims under those Acts and because 28 U.S.C. § 1367(a) ("Section 1367(a)") brings the Illinois Act claim within the federal courts' supplemental jurisdiction.

11. Rule 9(b) does *not* require particularized pleading of states of mind (*DiLeo,* 901 F.2d at 629) or of facts that if true would show that the defendant's alleged misrepresentations were indeed false (*Katz,* 36 F.3d at 675).

one hand, one of the Rule's core purposes is to provide adequate notice of the claim to the adverse party (*Vicom, Inc. v. Harbridge Merchant Serv., Inc.*, 20 F.3d 771, 777 (7th Cir.1994)), also meeting the corollary need for allegations that are sufficiently specific to allow defendants to respond and this Court to be well informed (*Davis*, 787 F.Supp. at 793). Thus a complaint that merely lumps defendants together and attributes alleged misrepresentations to them as a group is generally insufficient (*Sears v. Likens*, 912 F.2d 889, 893 (7th Cir.1990)).

■ At the same time, a transaction may be so complex that the specificity requirement of the rule is properly tempered (*Davis*, 787 F.Supp. at 793), or such easing of the standards may be called for where defendants are in sole possession of some specifics regarding the fraud (*id.*). As this Court observed in *Davis, id.*, imposing an obligation on plaintiffs to plead information that is only in defendants' hands would result in an untenable Catch–22: While plaintiffs would be entirely unable to gain access to the required facts without discovery, without those facts they would be wholly unable to stay in court to obtain that discovery (see also Note, *Pleading Securities Fraud Claims with Particularity under Rule 9(b)*, 97 Harv. L.Rev. 1432, 1436–38 (1984)).

Whirlpool has plainly met its Rule 9(b) burden in those terms. Its Complaint is sufficiently specific as to the time, place and content of the misrepresentations as well as the manner of communication.[12] As for the parties involved, the Complaint alleges both that the "PPM was prepared by GN, the Clark Group Defendants and Grace with help from Lehman Brothers" (Complaint ¶ 18) and that "Defendants intentionally and knowingly prepared the Projections with misrepresentations and omissions …" (*id.* ¶ 38). Rule 9(b) requires nothing more.

### Liability of the Parties

With that threshold matter out of the way, this opinion can turn to the general Rule 12(b)(6) inquiry as to whether the Complaint alleges a set of facts upon which relief against any or all of the parties might be granted. To that end it is first appropriate to assess the parties' respective roles in connection with the several counts of the Complaint.

■ At the outset, all the defendants clearly fall within the group of targets sought to be reached by the 1934 Act's Rule 10b–5. That Rule's wide-open language extends liability to those who defraud another "in connection with" the purchase or sale of a security. It is true that *Central Bank v. First Interstate Bank*, —— U.S. ——, ——, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994) has rejected aider-and-abettor liability under Rule 10b–5,[13] stating in part (emphasis added) that it "prohibits only the *making* of a material misstatement (or omission) or the commission of a manipulative act." But the Complaint survives in those terms because it alleges that GN, Grace, Clarks and Boks all prepared the Memorandum (Complaint ¶ 18).

Even though the Complaint thus stands as to all defendants in Rule 10b–5 terms, the situation is more problematic as to Grace, Clarks and Boks under 1933 Act § 12(2). To begin with, that section makes no provision

---

**12.** Complaint ¶ 40 asserts that Whirlpool was defrauded because the actual financial data from 1991–93 fell "dramatically below" what it calls "false" projections. Were that the sole extent of the allegations, the Complaint would fail (*DiLeo*, 901 F.2d at 627). But Whirlpool offers more. By way of affirmative misrepresentations other than the differing financial results, Whirlpool cites several statements appearing in the Memorandum that "reinforced the false and erroneous overall impression to [Whirlpool] that GN had the ability to service the interest and debt obligations" (Complaint ¶ 47). Claimed omissions include the failure of defendants to disclose certain impending negative trends in the industry and hidden agreements between GN and Leh-

man Brothers that would allegedly have affected Whirlpool's decision to purchase the note (*id.* ¶¶ 42–45, 48).

**13.** Surprisingly, a per curiam opinion that emanated from our Court of Appeals some three months after issuance of the highly publicized *Central Bank* decision (which had struck the securities bar like a thunderbolt because it was so unexpected—the aider-and-abettor question had been neither briefed nor argued by counsel) dealt with aider-and-abettor liability as though it were still a viable theory of recovery (*National Union Fire Ins. Co. v. Wilkins–Lowe & Co.*, 29 F.3d 337, 340–41 & n. 4 (7th Cir.1994)).

for secondary liability. In the course of an extensive discussion of that issue, *Ackerman v. Schwartz*, 947 F.2d 841, 845 (7th Cir.1991) has expressly reconfirmed the announcement in *Schlifke*, 866 F.2d at 942 that the imposition of aider-and-abettor liability under that provision would corrupt the scheme of the 1933 Act:

> [N]otions of aiding and abetting liability would be inconsistent with the intent and language of the statutory provision which expressly limits to offerors and sellers the categories of persons who may be sued.

Liability can therefore attach under 1933 Act § 12(2) only upon a finding that there has been a primary violation.

There are two classes of primary violators under that section: those who offer and those who sell the security at issue. And for that purpose the statute specifically makes an offeror liable only "to the person purchasing such security from him." While at first blush that language might be thought to restrict the class of offerors potentially liable under 1933 Act § 12(2) to the *owners* of securities, *Pinter v. Dahl*, 486 U.S. 622, 644, 108 S.Ct. 2063, 2077, 100 L.Ed.2d 658 (1988) teaches in the context of 1933 Act § 12(1) that one who solicits a purchaser yet does not possess title may still be held accountable. And that analysis extends to 1933 Act § 12(2) as well (*Ackerman*, 947 F.2d at 844, addressing the issue that was reserved in *Pinter*, 486 U.S. at 642 n. 20, 108 S.Ct. at 2076 n. 20).

■ As the issuer of the security involved here—the subordinated note—GN itself is of course both an offeror and seller under 1933 Act § 12(2), as well as being subject to primary liability under Rule 10b–5. If any of Grace, Clarks and Boks are also to be held liable under that section as primary violators, that can be only as "offerors." But none of them owned the note, and the Complaint does not allege that any of them actively solicited Whirlpool. In fact, it appears from the Exhibits attached to the Complaint that GN contracted with Lehman Brothers to be primarily responsible for soliciting Whirlpool's interest (Complaint Ex. B). Though the Complaint *does* allege that Grace, Clarks and Boks participated in preparing the Memorandum, such involvement alone falls short of rendering them offerors under 1933 Act § 12(2) (1 Thomas Hazen, *Law of Securities Regulation* ("Hazen") § 7.2, at 286 & nn. 32–33 (2d ed. 1990)).

■ There is one last route open for Whirlpool to plead the liability of Grace, Clarks and Boks under 1933 Act § 12(2): control person liability. Liability under both Rule 10b–5 and 1933 Act § 12(2) extends to such "control persons" under 1934 Act § 20(a) and 1933 Act § 15 respectively. *Donohoe v. Consolidated Operating & Prod. Corp.*, 30 F.3d 907, 911–12 (7th Cir.1994) teaches that an individual must satisfy a two-pronged test before being considered a control person under the 1933 and 1934 Acts:

> First, the "control person" needs to have *actually* exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability.

■ On that subject the Complaint is not entirely clear—Whirlpool mentions only that Grace was the sole GN stockholder before July 16, 1991 (Complaint ¶ 7) and self-servingly concludes that Clarks and Boks are control persons because they were parties to the Shareholders Agreement pursuant to which Kevin and Robert were elected directors (*id.* ¶ 12). It also appears that while Grace controlled GN when the allegedly misleading Memorandum and Rider were published, it had become a minority shareholder by the time of sale of the note on July 16 (*id.* ¶ 24(b)). At that point Clarks and Boks, who had no apparent involvement with GN before July 15, controlled that corporation through their aggregate 51% ownership (see, e.g., *Donohoe v. Consolidated Operating & Prod. Corp.*, 982 F.2d 1130, 1139 (7th Cir.1992)). Those distinctions might be critical, because control person liability attaches only to a person who was in control at the time that the liability of the controlled person accrued, not to someone who later takes control (9 Louis Loss & Joel Seligman, *Securities Regulation* 4472 (3d ed. 1992)).

Despite its lack of precision on that score, the Complaint does allege facts that might support a finding that Grace, Clarks and Boks all qualify as control persons under the 1933 Act. As Justice Powell's concurring opinion in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) put it:

> The starting point in every case involving construction of a statute is the language itself.

And as pointed out earlier, 1933 Act § 12(2) extends liability to one who offers *or* sells a security.

GN did both of those things, but at different times and under different leadership. Beginning in February 1991 GN *offered* to sell a note to Whirlpool by way of a prospectus [14] that allegedly contained misrepresentations and material omissions (Complaint ¶ 18). As GN's sole stockholder at the time, Grace clearly qualifies as a control person and is therefore potentially liable jointly and severally with GN for any misrepresentations or omissions appearing in or absent from the Memorandum and Rider. Then on July 16, 1991 GN *issued* the note to Whirlpool without having cured any of the alleged misrepresentations or omissions in the Memorandum and Rider. By that time Clarks and Boks owned 51% of the stock of GN and consequently qualify as control persons as well,[15] potentially incurring joint and several liability with GN and Grace for the allegedly fraudulent sale by means of the Memorandum and Rider.

To this point, then, all of the defendants remain potentially liable.[16] If they are to escape from this action, it must be on some other basis. This opinion therefore turns to other lines of analysis—first to the basic actionability vel non of the alleged misrepresentations and omissions, given the cautionary caveats included in the Memorandum and Rider, and then to the possible untimeliness of this action.

### Mixed Signals?

Predictions are indeed potentially actionable under the federal securities laws (6 Alan Bromberg & Lewis Lowenfels, *Securities Fraud & Commodities Fraud* § 7.2, at 147–49 (1993)). But in an infinitely large universe of honest and careful projections, half will turn out to be too optimistic (*Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 514 (7th Cir.1989)). Hence *DiLeo*, 901 F.2d at 627 counsels:

> Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

This opinion must therefore examine the facts alleged in the Complaint to see whether they might reasonably support a finding that the projections implied the presence of facts that did not really exist (1 Hazen § 3.7, at 119) or whether this is rather a case where Whirlpool has simply charged "fraud by hindsight" (*DiLeo*, 901 F.2d at 628).

 To support a finding of fraud under either 1933 Act § 12(2) or Rule 10b–5, a putative plaintiff must point to misrepresentations or omissions that were "material." Any statement or omission is material if there is a "substantial likelihood" that disclosure of the misrepresentation or omitted fact "would have been viewed by the reasonable

---

**14.** Certainly the Memorandum and Rider fit the definition of a "prospectus" in 1933 Act § 2(10)—(see *Pacific Dunlop Holdings, Inc. v. Allen & Co.*, 993 F.2d 578, 588 (7th Cir.1993)).

**15.** At that point Grace might still very well be viewed as part of the control group with the four individuals, because there is nothing to suggest that they were at all at odds in setting policy for, or in operating, the GN enterprise (see *Donohoe*, 982 F.2d at 1139).

**16.** Having said all of this, this Court is constrained to note a special element of illogic in Whirlpool's claims against Grace. As Grace–GN Mem. 11–12 and R.Mem. 11 point out, Whirlpool would have it that Grace participated in a false portrayal of GN's prospects in order to bring Whirlpool's $10 million into an acquisition deal in which Grace was itself contemporaneously investing for the first time—placing some $25.7 million of its own money at risk in securities ($25.2 million in preferred stock and nearly $.5 million in common stock) that ranked *behind* Whirlpool's loan. *DiLeo*, 901 F.2d at 629 counsels that courts ought to take an especially hard look at what appears to be irrational economic behavior.

investor as having significantly altered the 'total mix' of information made available" (*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). Dismissal on materiality grounds is appropriate only where the disclosures or omissions are so clearly nonmaterial in that sense that reasonable minds could not differ (*In re First Chicago Corp. Sec. Litig.*, 769 F.Supp. 1444, 1451 (N.D.Ill.1991)).

▆▆ "In general, reliance on projections as a forecast of the future is unreasonable as a matter of law if those projections are accompanied" by sufficiently cautionary language disclosing the potential risks involved (see *In re Colonial Ltd. Partnership Litig.*, 854 F.Supp. 64, 92 (D.Conn.1994), collecting cases). Thus if Whirlpool simply claimed that it relied upon the projections appearing in the Memorandum and Rider and it later sued for fraud only when those predictions were not borne out, there is little question that the cautionary statements appearing in the Memorandum (though Whirlpool Mem. 15 disparages them as mere "boiler plate") would bar Whirlpool's recovery.

But Whirlpool claims something more. Its Complaint alleges that (1) it relied upon the projections as evidence that the travel-nurse industry was thriving and would be thriving well into the future, enabling GN to repay the note principal as well as the ongoing interest on the note (Complaint ¶¶ 50, 51), (2) defendants knew that Whirlpool would so rely (*id.* ¶ 37) and (3) defendants knew or recklessly disregarded the fact that their roseate description of the industry was inaccurate (*id.* ¶ 42–44).

Thus the inquiry properly begins in terms of whether *any* reliance on the projections was reasonable in light of the contemporaneous cautionary language. If not, Whirlpool loses at the outset; but if it survives that threshold examination of initially-reasonable reliance, the inquiry must go on to another level. At that next level the question becomes whether a "total mix" made up of (1)

particularized and knowingly false characterizations of a current business environment and what it bodes for the future, coupled with (2) merely generalized cautionary statements, rendered Whirlpool's continuing reliance on the former justifiable even after the future did not develop in accordance with the projections (or to put the flip side of that question, whether that same total mix should have triggered Whirlpool's awareness of possible fraud when the predictions proved to be totally at odds with the real-world developments).

▆▆ It follows from all that has been said to this point that this Court must first determine whether the Memorandum, when read as a whole, sufficiently red-flagged the critical risks facing Whirlpool in the travel-nurse industry so that Whirlpool cannot now reasonably claim that it was misled by the predictions. At one extreme, boiler plate cautionary language concerning the risks inherent in any forecast provides no insulation for the issuer or control person, for an investor might still be entitled to rely on the detailed predictions as material reflections of a healthy industry (accord, *Colonial Ltd.*, 854 F.Supp. at 93). At the other extreme, the disclosure of risks attendant to the investment may be so detailed and so prominently presented that the predictions are rendered immaterial and the investor is charged with inquiry notice of possible fraud from the moment that it purchases the security (*Chance v. F.N. Wolf & Co.*, 1994 WL 529901, at *2, 4–5, 1994 U.S.App. LEXIS 27508, at *5, *12–*13 (4th Cir. Sept. 30); *Harner v. Prudential–Bache Sec., Inc.*, 1994 WL 494871, at *5–6, 1994 U.S.App. LEXIS 25266, at *17–*18 (6th Cir. Sept. 9)).

▆▆ On balance, this case is not one in which the cautionary statements appearing in the Memorandum were such storm warnings as to render its numerous optimistic predictions immaterial from the very outset as a matter of law.[17] To begin with, the

---

17. Those same cautionary statements do, however, suffice to stave off Whirlpool's frontal assault on the Memorandum as fatally deficient because it purportedly failed to reveal any risk factors associated with the purchase of the note (Complaint ¶ 48(c)). Where omitted or misrepresented facts and circumstances have actually been disclosed in the relevant transaction document, no liability exists under the securities laws (*Acme*

optimism driving the forecasts is virtually palpable, far exceeding the routine gloss for which a venture's proponents might be forgiven (all of the following excerpts are quotations from the Memorandum, followed in each instance by the page reference in parentheses): [18]

> Temporary personnel is an innovative and rapidly growing industry which provides both workers and employers added labor market flexibility. (30).

> The temporary staffing industry has experienced rapid growth over the past ten years. (*id.*).

> The growing shortage of nurses is a critical and troubling issue confronting nearly all segments of the U.S. health care system. (*id.*).

> Travel nurse agencies provide an effective answer to the nursing shortage because they have access to a national pool of personnel and can efficiently move nurses into areas of high demand. (33).

> CCHP is often told by its hospital clients that it provides the "most qualified health care professionals available." (2).

> CCHP often hears from its traveling professionals that it is the "best company to travel with" industry-wide. (*id.*).

> CCHP has experienced exceptional profitability since inception as a result of management's systems and controls. (6)

> The traveling nurse industry is expected to experience continued rapid growth. (7).

> CCHP is the nation's leading company within the travel industry.... (*id.*).

> CCHP has achieved the number one position in its market by consistently providing outstanding services to both its hospital clients and health care professionals. Since its inception less than five years ago, CCHP has grown to $81.6 million in revenues for 1990. (34).

> The Company will benefit from its affiliation with Grace, a $6.1 billion company with interests in specialty chemicals, health care and natural resources. (8).

> CCHP has developed an exceptionally successful image in its marketplace by offering the highest level of professionalism and dependability to hospitals and traveling nurses. (*id.*).

> The Company foresees significant revenue and earnings growth potential in its businesses. This can be evidenced by the following: (i) to date, CCHP has developed relationships with only approximately 13% of the 7,000 hospitals located in the U.S. ... (ii) CCHP's recent venture into the radiologic technologist, physical therapist and respiratory therapist areas of the health care industry represent tremendous potential for growth.... (*id.*).

Offsetting that repeated glowing portrayal of the travel-nurse industry is a single page entitled "Risk Factors." Nowhere on that page does the prospective investor encounter any cautionary statement that must be held, as a matter of law, to have been sufficiently tailored to mitigate the aggressive optimism expressed in the memorandum (compare *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371–72 (3rd Cir.1993)). Instead, even the single statement that calls into question the strength of the travel nurse industry is preceded by this clause: "Although studies show that there is a current shortage of nurses in the U.S. and project that this shortage will continue in the foreseeable future...." (Memorandum 9).

■ In general terms, cautionary language is not *necessarily* sufficient to render predictive statements immaterial as a matter of law (*Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir.1994)). Instead the circumstances surrounding the warnings and the predictions must be taken into account (*id.* at

---

*Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322–24 (7th Cir.1988)).

18. Reference to statements appearing in an exhibit to dispatch arguments made in the Complaint is entirely consistent with Rule 12(b)(6) jurisprudence. This Court need not "ignore any facts alleged in the complaint that undermine the plaintiff's claim" (*Arazie v. Mullane*, 2 F.3d 1456,

1465 (7th Cir.1993))—and where as here an exhibit contradicts the assertions made in the complaint itself and reveals facts that foreclose recovery as a matter of law, the exhibit controls (*Hamilton v. O'Leary*, 976 F.2d 341, 345 (7th Cir. 1992); 5 Charles Wright & Arthur Miller, *Federal Practice and Procedure: Civil 2d* § 1327, at 766–67 (2d ed. 1990)).

167–68). In this instance the circumstances described in the Complaint preclude a ruling at this threshold stage that the projections and favorable statements upon which they were based would indisputably have been deemed inconsequential by a reasonable investor confronted with the cautionary statements appearing in the Memorandum (accord, *First Chicago Corp. Sec. Litig.*, 769 F.Supp. at 1452).[19]

### Statutes of Limitation

 But as was signaled earlier, that merely enables Whirlpool to dodge the first bullet—the one aimed at its perspective at the time of investment. What remains for consideration is whether Whirlpool could continue to rely on the reasonableness of that initial perspective, or whether ensuing events that were sharply at odds with the memorandum's prognosis put Whirlpool on inquiry notice such that its federal claims were filed too late via this lawsuit—the latter alternative is the basis for defendants' contention that both federal claims are barred by the applicable statutes of limitation. Whirlpool responds in two ways:

1. Limitation claims are not the proper subject of a motion to dismiss because they depend on questions of fact.

2. In any event, Whirlpool was lulled into complacency by defendants, who are therefore estopped from pressing such claims.

Ironically, analysis demonstrates that the same factors that have been examined in upholding Whirlpool's claim in the face of the Memorandum's cautionary language mandate the dismissal of those claims under the relevant statutes of limitations.

Under 1933 Act § 13 the limitations period for a 1933 Act § 12(2) claim is just one year after the limitations clock begins to tick. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 361–62, 111 S.Ct. 2773, 2781–82, 115. L.Ed.2d 321 (1991) has similarly held that the one-year limitations period specified in 1934 Act § 9(e) applies to claims brought under 1934 Act § 10(b) and Rule 10b–5.

 In each instance the year is measured from the date when an investor becomes aware of facts that would have led a reasonable person to investigate whether he or she might have a claim ("inquiry notice"). Under the terms of 1933 Act § 13 (emphasis added):

No action shall be maintained to enforce any liability created under section 11 or section 12(2) unless brought within one year after the discovery of the untrue statement or the omission, *or after such discovery should have been made by the exercise of reasonable diligence....*

There is no such language as to "reasonable diligence" in 1934 Act § 9(e), but *Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 722 (7th Cir.1993) explicitly extended the concept of inquiry notice to that statute and hence to Rule 10b–5 actions. In all events "investors are not entitled to nail down 'every last detail of a transaction' before they may be charged with knowledge sufficient to

---

**19.** Nor would a different conclusion be called for under the related "bespeaks caution" doctrine, as characterized in a description quoted by *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir.1994):

> The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.

At least seven circuits have now adopted that doctrine (*id.* at 1413–14, collecting cases). But our Court of Appeals has gone no further than to take note of the doctrine and to decline to apply

it in a particular situation (*Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1417 & n. 5 (7th Cir.1992)). That may be because the doctrine "merely reflects the unremarkable proposition that statements must be analyzed in context" (*Rubinstein,* 20 F.3d at 167). Certainly the context here was not such that it must inevitably be concluded that the "statements contained within the prospectus clearly 'bespeak caution,' rather than encouraging optimism" (*I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir.1991)). Nor can it be said that the "true statements may discredit the other [misleading statement] so obviously that the risk of real deception drops to nil" (*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097, 111 S.Ct. 2749, 2760, 115 L.Ed.2d· 929 (1991)).

start the running of the limitations period" (*Donohoe*, 982 F.2d at 1141).[20]

Albeit without conceding that Whirlpool has alleged enough to support any claims of securities fraud, defendants urge that if any such claims *are* viable Whirlpool was on inquiry notice of the asserted fraud well over a year before it filed the Complaint in July 1994. Both the financial statements provided to Whirlpool in accordance with the Subordinated Loan Agreement and the annual visits of Whirlpool's own representative with Kevin and others are cited as evidence that Whirlpool should have known of the alleged fraud for at least a year (and more likely several years) before it filed it Complaint. Whirlpool responds that the divergence of projections from actual results does not necessarily indicate fraud, so that the issue is manifestly a question of fact. Whirlpool also appears to argue an equitable estoppel theory, claiming that it was lulled into believing in an imminent industry turnaround.

Even when the necessary reasonable inferences are drawn in Whirlpool's favor, the facts that it has itself pleaded clearly establish that it was placed on inquiry notice well before July 1993. Under the terms of Subordinated Loan Agreement §§ 5.1(A) to (C), Whirlpool was to receive monthly and quarterly financials within a month after the close of each period.[21] Complaint ¶ 40 describes the picture disclosed by those financials:

GN's Net Sales, Operating Profit, Pretax Profit, Net Income and EBITDA [Earnings Before Interest, Taxes, Depreciation and Amortization] in the second six months of 1991, and the years 1992 and 1993 were dramatically below those set forth in the Projections.

Whirlpool has also helped to dig its own grave by tendering, in response to defendants' motion to dismiss, the affidavit of Whirlpool's own account executive in charge of the GN transaction, Steven Furman ("Furman").[22] Furman met with Kevin and others on several occasions. On September 12, 1991 Furman discussed the "softness in the traveling nurse industry" with Kevin and GN's Executive Vice–President and Chief Financial Officer Emil Hensel ("Hensel") (Furman Aff. ¶ 4). On February 5, 1992 Furman "discuss[ed] the industry trends, review[ed] 1991 results and [ ] discuss[ed] GN's outlook for 1992 and beyond" with Hensel and Kevin (*id.* ¶ 5). At that February 1992 meeting Furman was also told that the "recovery period for the temporary staffing industry was likely to lag a rebounding economy by two quarters" (*id.*). At another meeting on July 24, 1992 Furman was informed by Clark only that GN would have no problem meeting its debt service obligations "for the next few years" (*id.* ¶ 6). During still another meeting on October 16, 1992 Clark acknowledged a "current downturn" in the industry and noted that the "national nursing shortage, the primary driver of demand in the travel

**20.** 1933 Act § 13 and 1934 Act § 9(e) also contain a three-year statute of repose that bars all actions not commenced within three years after the sale of the security, regardless of the time of discovery or deemed discovery. Here Whirlpool purchased the Note on July 16, 1991 (Complaint § 24) and filed the Complaint on July 11, 1994, five days before those "drop-dead" provisions would have barred both Count I and Count III.

**21.** Defendants' Mem. 4–5 correctly points out that (1) Whirlpool has not disputed its having received the financials required by the Subordinated Loan Agreement and (2) if it had *not* done so, such a failure by GN to adhere to the Subordinated Loan Agreement would itself have placed Whirlpool on inquiry notice (in the latter respect, see *Hernandez v. Childers*, 736 F.Supp. 903, 908–09 (N.D.Ill.1990)).

**22.** This opinion may properly consider the facts alleged in the Furman affidavit. As *Dausch v. Rykse*, No. 93–1459, —— F.3d ——, —— n. 3,

1994 U.S.App. LEXIS 35213, at *3 n. 3 (7th Cir. Dec. 16) has said in closely related circumstances:

The facts asserted in the memorandum in opposition to the motion to dismiss, but not contained in the complaint, are relevant to the extent that they "could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 [104 S.Ct. 2229, 2232, 81 L.Ed.2d 59] (1984); *Hrubec v. National R.R. Passenger Corp.*, 981 F.2d 962, 964 (7th Cir. 1992). Because a plaintiff may point to "facts consistent with the existing language of the complaint to establish entitlement to prevail," *American Inter–Fidelity Exch. v. American Re–Insurance Co.*, 17 F.3d 1018, 1022 (7th Cir. 1994), we set forth, for the sake of completeness, the factual allegations made in the memorandum in opposition.

nurse industry, will remain moderate in 1993 before beginning to increase again in 1994–1995" (*id.* ¶ 7). When Furman visited GN again on June 23, 1993, he was once again informed that the demand for travelling nurses continued to be soft in 1993 (*id.* ¶ 8).

Whirlpool was therefore provided with the limitations-clock-starting inquiry notice as early as September 1991, and certainly not later than June 1993. At least by the latter date the Memorandum's projection of "continued rapid growth" of the travel-nurse industry (Memorandum 7) resembled pure fantasy, and GN's operating profits, initially projected to "remain strong" (*id.*), had been reported at less than half of the projected values for the last six months of 1991 and all of 1992 and 1993 (Complaint ¶ 40). As *Hupp v. Gray,* 500 F.2d 993, 996–97 (7th Cir.1974) has put it succinctly:

> At the very least, these circumstances should have aroused suspicion or curiosity on the part of plaintiff.

It should be emphasized that this point does not require a holding by this Court that defendants were actually guilty of committing securities fraud by what they had said about the future in the Memorandum. It is rather that Whirlpool is hoist by its own petard: If those statements about future prospects are to be treated as false statements of present facts sufficient to ground fraud claims at all, the falsity of those statements had become painfully apparent well over a year before July 1994.

It is symptomatic of Whirlpool's present failure to face the realities that its Mem. 8 makes the untenable argument (in the course of attempting to distinguish *Tregenza* because that case involved publicly-traded securities):

> Indeed, in the context of private debt, the ultimate measure of whether GN lived up to its promises was whether it made the payments of interest that it had promised to make. These cash payments were fully and timely made until April 1, 1994.

For one thing, that premise is patently false—even a failing enterprise may be able to honor its current interest-only commitments although it doesn't have a prayer of meeting the balloon principal obligation when it falls due. Whirlpool's regular and detailed access to information about the realities of GN's finances was dramatically different from that of the creditor whose only knowledge of the debtor comes from opening (or from not receiving) an envelope containing an interest check every three months.

It must be kept in mind that the nature of Whirlpool's securities fraud claims is that the *Baedeker* to GN's industry that had been furnished by GN and its principals was a false travel folder at the very beginning— that they had painted a false picture of the accommodations to be anticipated by the traveler (the hapless investor) by committing sins of both commission (actual misrepresentations) and omission (the failure to disclose material facts). If those claims have any force at all, it had to have become apparent to any reasonable traveler that the major adversities that were consistently reported as having been encountered in the course of the long voyage were such as to demand an inquiry into whether something had not already been rotten in the state of Denmark (in this case, in the industry in which GN was engaged) at the time that the brochure was originally prepared. *Tregenza,* 12 F.3d at 720 provides an appropriate summary in an analogous context:

> By that time a stock which they had been told a year earlier was greatly undervalued and would soon be worth twice as much and at worst would not fall by more than 10 percent had lost almost 90 percent of its value. This did not *prove* fraud. Lehman might have believed reasonably and in good faith, though erroneously, that the stock was undervalued, and probably no reasonable investor would have taken Lehman's representations as an actual *warranty* that the stock would not decline in value by more than 10 percent and would soon double in value. No reasonable investor would think that a stock's value can move in only one direction. But such an investor would have become suspicious and investigated when Lehman's emphatic and precise predictions was so swiftly and dramatically falsified.

■ Nor does Whirlpool's assertion of equitable estoppel alter the result. It is true that our Court of Appeals has said that the door may be open for such a theory in the securities fraud context (*Tregenza*, 12 F.3d at 721), but even assuming that Whirlpool's assertions on that point are true they do nothing to advance Whirlpool's cause. As an initial matter, Whirlpool has *not* alleged that it was thwarted from suing in time because, for example, defendants promised not to plead the statute of limitations. Whirlpool claims only that defendants' reassurances lulled it into thinking that the industry would recover. Such a claim is really an argument for equitable tolling rather than for equitable estoppel (see *Chance*, 1994 WL 529901, at *5, 1994 U.S.App. LEXIS 27508, at *14–*15), and it therefore merely merges into this opinion's earlier discussion of inquiry notice (*Tregenza*, 12 F.3d at 721).

Whirlpool's argument for equitable tolling also fails for a more general reason that betrays its misconception of this Court's inquiry regarding the statutes of limitation. For that purpose the key referent is the time when the allegedly fraudulent statements were made: the time that the Memorandum and Rider were issued and delivered in conjunction with Whirlpool's investment. Thus the notice issue properly focuses on when in the course of events Whirlpool should have recognized that the initial predictions were false when they were made and that the industry was not as healthy as it had been represented at the outset. That possibility certainly became apparent when GN's financials revealed such a precipitous and ongoing drop from predicted values. Any assurances by GN that the industry would recover in the *future* could not stuff the bullet back into the muzzle—those assurances could not excuse Whirlpool's failure to inquire at that point whether it had been lied to in the *past*.[23]

And again that duty to inquire is what started the one-year time clock ticking well over a year before the Complaint was filed.

Whirlpool has thus lived and died by the same sword. Its Complaint could survive despite the Memorandum's cautionary language only because Whirlpool has alleged that it relied on the predictions in the same Memorandum not only as forecasts of future results but as indicative of a currently healthy industry as well. Yet having so relied, any reasonable investor would quickly have become disillusioned as to the state of the industry *at the time that those predictions were made* when GN failed so dismally to come close to meeting its projections on such a regular and ongoing basis—when the actual financial results, instead of reflecting the upward trend that the Memorandum's initial portrayal of relevant factors would have produced (perhaps temporarily interrupted by transient factors of a short-term nature), time after time showed exactly the opposite. Whirlpool must therefore be charged with inquiry notice before July 1993 as a matter of law, and its federal claims—not asserted until the Complaint was filed in July 1994—are accordingly dismissed.

### *Whirlpool's State Law Claims*

■ As to the state-law claims advanced in Complaint Count II, Clarks and Boks argue that they are not subject to this Court's personal jurisdiction. This Court finds that contention unpersuasive in the present context (in which a state law claim has been annexed, via the supplemental jurisdiction provision of Section 1367(a), to federal question claims brought under statutes that authorize the nationwide service of process[24]). But it need not pause to expound its reasons for that conclusion,[25] given the appropriate-

---

**23.** Whirlpool's argument that it was not put on inquiry notice because it was promised that GN would meet its debt payments in the near future is similarly infirm. Not only does the claim similarly fail to address whether GN's representations were fraudulent when made, but it falls short on its own terms—no sophisticated lender such as Whirlpool could claim to find comfort from such a statement, which said nothing about the ability to meet such interest payments for the *entire* term of the loan or, even more important-

ly, the ability to pay the *principal* by a single lump sum due at the end of the term.

**24.** See 1934 Act § 27 and 1933 Act § 22(a).

**25.** On that score, see Robert Casad, *Personal Jurisdiction in Federal Question Cases*, 70 Tex. L.Rev. 1589, 1606–08 (1992) and cases cited there.

ness of dismissing Count II by reason of the dismissal of the 1933 and 1934 Act claims.

*Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir.1994) (citations omitted) expands on the familiar teaching of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) in such circumstances:

> The supplemental jurisdiction statute codified judge-made principles of pendent jurisdiction. Pendent jurisdiction is a doctrine of discretion. Thus, a district court should consider and weigh the factors of judicial economy, convenience, fairness and comity in deciding in whether to exercise jurisdiction over pendent state-law claims. In the usual case in which all federal claims are dismissed before trial, the balance of these factors will point to declining to exercise jurisdiction over any remaining pendent state-law claims. Hence the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.

*Wright, id.* at 1251–52 then goes on to observe that there may be unusual exceptions to that general rule, as where (1) the statute of limitations governing the pendent claim has run, (2) substantial judicial resources have already been expended that would create a substantial duplication of effort in the state court or (3) it is absolutely clear how the pendent claim would be decided.

Here it is unclear whether the Illinois three-year statute of limitations (Illinois Act § 13(D)) has run. That, coupled with the early stage of this litigation and the complexity of the claims involved, leads this Court to adhere to the general rule by dismissing the remaining state law claim without prejudice.

### Conclusion

To recap, while the Complaint satisfies Rule 9(g), Whirlpool's federal claims under the 1933 and 1934 Acts are barred by the respective one-year statutes of limitations: It was placed on inquiry notice well before it filed the Complaint in July 1994. Hence Counts I and III are dismissed with prejudice. That in turn calls for the dismissal of Count II without prejudice. And because the defect that has led to dismissal of the federal claims in the Complaint is incurable, this action is dismissed in its entirety.[26]

---

**26.** Although the submissions by the litigants on the current motions did a creditable job of focusing most of the issues for decision, several of the paths followed in this opinion were first marked out for exploration by insights from this Court's law clerk Donald Walther, Esq. This must be understood as ascribing only credit, and no possible blame, for those efforts: For better or worse, every sentence appearing here has been worked and reworked, and every authority cited here has been read in detail, by this Court. If then any flaw exists in the ultimate work product, the fault must be laid at this Court's own doorstep and not that of its law clerk.